244 N.W.2d 30 (1976)
In re WELFARE OF I. Q. S.
In re WELFARE OF E. T. B.
In re WELFARE OF T. L. P.
In re WELFARE OF J. E. C.
In re WELFARE OF William HUNTER.
In re WELFARE OF Fred Christopher ROMANOWSKI.
In re WELFARE OF Donald AMOS.
In re WELFARE OF Paul Lawrence WRIGHT.
STATE of Minnesota, Plaintiff,
v.
Steven Craig PARKER, Defendant.
Nos. 45988-45990, 46089, 46215, 46254, 46158, 46174 and 46416.
Supreme Court of Minnesota.
June 4, 1976.
Rehearing Denied July 21, 1976.
*34 Warren Spannaus, Atty. Gen., St. Paul, Gary W. Flakne, Hennepin County Atty., Vernon E. Bergstrom, David W. Larson, Michael H. McGlennen, Asst. County Attys., Minneapolis, for appellants in Nos. 45988, 45989 and 45990.
James J. Krieger, Legal Rights Center, Inc., Minneapolis, for appellant in No. 46089 and respondent in No. 45989.
Wm. R. Kennedy, Hennepin County Public Defender, Wm. J. Gatton, Asst. Public Defender, Minneapolis, for appellant in No. 46215.
Wm. R. Kennedy, Hennepin County Public Defender, Lane E. Ayers, Asst. Public Defender, Minneapolis, for appellant in No. 46254.
Wm. R. Kennedy, Hennepin County Public Defender, James N. Willis, Asst. Public Defender, Minneapolis, for appellants in Nos. 46158 and 46174.
Stephen M. Goldfarb and George W. Roberts, Minneapolis, for respondent in No. 45988.
Patricia Belois, Asst. Hennepin County Public Defender, Minneapolis, for respondent in No. 45990.
Warren Spannaus, Atty. Gen., Craig R. Anderson, Sp. Asst. Atty. Gen., St. Paul, for respondent in No. 46089.
Gary W. Flakne, Hennepin County Atty., Vernon E. Bergstrom, David W. Larson, Michael H. McGlennen, Asst. County Attys., Minneapolis, for respondents in Nos. 46089, 46215, 46254, 46158 and 46174.
Gary W. Flakne, County Atty., Vernon E. Bergstrom, Michael H. McGlennen, David W. Larson, Asst. County Attys., Minneapolis, Warren Spannaus, Atty. Gen., St. Paul, for plaintiff in No. 46416.
Doyle, Henschel & Erickson, Stephen Patrick Doyle, Minneapolis, for defendant in No. 46416.
Adrienne Volenik and Robert Fowler, National Juvenile Law Center, St. Louis, Mo., amicus curiae.
Warren Spannaus, Atty. Gen., Richard G. Mark, Asst. Atty. Gen., James N. Bradford, Asst. Atty. Gen., Edward M. Laine, Sp. Asst. Atty. Gen., St. Paul, amicus curiae for Dept. of Corrections.
Considered and decided by the court en banc.
Rehearing Denied July 21, 1976 in Nos. 46089 and 46215.
SCOTT, Justice.
These nine appeals are before us for review of specified orders of the juvenile courts either denying or granting motions of the state for certification of the subject juveniles for prosecution as adults. As such, we have undertaken their consolidation for purposes of this opinion to discuss the focal issue of the standards to be employed by a juvenile court in its disposition of such motions, with a subsequent application of the announced principles to the individual appeals.
This complex and perplexing problem which we now face has materialized with the ever-increasing number of challenges to juvenile court procedures employed upon a *35 motion for reference pursuant to Minn.St. 260.125.[1]
This court is deeply committed to the utilization of procedures which will both ensure and satisfy the ultimate in applicable constitutional safeguards. However, as the entire juvenile system is based upon and continually revised by legislative pronouncements directing its growth and delineating its scope, we are guided by those controlling legislative standards to a resolution of the primary issue presented.

Appealability
The recent United States Supreme Court decision of Breed v. Jones, 421 U.S. 519, 95 S.Ct. 1779, 44 L.Ed.2d 346 (1975), has precipitated the reevaluation of the issue of appealability as formerly pronounced in In re Welfare of A. L. J., 300 Minn. 542, 220 N.W.2d 303 (1974). At that time we had concluded that orders of the juvenile court which denied the state's motion to refer a juvenile for prosecution as an adult were nonappealable on the basis that they were not final orders within the meaning of Minn.St. 632.11, subd. 1. Such a conclusion was premised upon the theories that the orders did not have the substantive effect of precluding proceedings by the state, and, additionally, because they did not unconditionally deny referral for adult prosecution.
However, in Breed v. Jones, supra, the Supreme Court examined a California statute which empowered the juvenile court to refer a juvenile for adult prosecution after an adjudicatory hearing. This procedure, the court reasoned, was violative of the double jeopardy clause of the Fifth Amendment as applied to the states through the Fourteenth Amendment.
An application of this principle to the procedures employed in this state's juvenile court system requires the conclusion that the referral decision is a final order and therefore appealable by either the state or the subject juvenile. Appeals are thus to be perfected by compliance with the procedures clearly defined in Minn.St. 260.291, subd. 1.[2]

Equal Protection
A common contention put forward by juveniles challenging orders of reference is that the statute governing this procedure is *36 invalid as a denial of equal protection to the extent it imposes upon certain juvenile offenders a different or higher punishment than that imposed upon all other juvenile offenders for like or joint offenses. Included within this equal protection argument are the additional constitutional claims that the statute fosters a denial of due process in that it is impermissibly vague and that it is arbitrarily and capriciously applied.
An analysis of the vast authority commenting upon the constitutional assertions raised herein requires that we reject the conclusion that Minn.St. 260.125 is invalid as unconstitutional.
Premised upon the clear expression that waiver proceedings are generally permissible when they satisfy specified guidelines, Breed v. Jones, supra, we must examine the caveats espoused in relation to the effective implementation of statutory reference for prosecution of a juvenile as an adult.
The United States Supreme Court in Kent v. United States, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966), reviewed the procedural safeguards necessary to a waiver of the juvenile court's jurisdiction. It concluded that the "critically important" question of whether a child will be deprived of the special protections and provisions of the applicable juvenile court act must be determined pursuant to a hearing in which the juvenile will participate and upon a sufficient statement of the reasons relied upon in the juvenile court's referral decision. 383 U.S. 556, 86 S.Ct. 1055, 16 L.Ed.2d 94.
Although Kent was an interpretation of a District of Columbia statute, its principles were raised to constitutional proportions in In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). As a result of these decisions, four procedural safeguards, meeting due process requirements, must attend all waiver proceedings:
(1) If the juvenile court is considering a waiver of jurisdiction, the juvenile is entitled to a hearing;
(2) The juvenile is entitled to representation by counsel at such hearing;
(3) The juvenile's attorney must be given access to the juvenile's social record on request; and
(4) If jurisdiction is waived, the juvenile is entitled to a statement of reasons in support of the waiver order.
We find no authority which, by implication, would necessitate a conclusion that Minn.St. 260.125 lacks ascertainable standards so as to vitiate a reference proceeding held pursuant to that statute. Reliance upon People v. Fields, 388 Mich. 66, 199 N.W.2d 217 (1972), where the Michigan Supreme Court held that a reference statute was unconstitutional for lack of standards to guide its application, is misplaced because of the wholly distinguishable Michigan reference statute.[3]
Minn.St. 260.125 provides suitable and ascertainable standards and therefore survives the challenge that it is impermissibly vague. In addition, this statute compares favorably with the Uniform Juvenile Court Act, § 34, advocated by the National Conference of Commissioners on Uniform *37 State Laws.[4] We therefore find no violation of equal protection regarding the reference procedure utilized in this state.
Analogous to the procedure resulting in keeping a juvenile in the treatment-oriented sphere rather than transferring him to the adult criminal forum are the numerous pretrial diversionary programs functioning in cooperation with various public and private agencies.[5] These community corrections services place certain nonviolent first-offenders in qualified specific work or training programs. Procedurally, a defendant agrees that his case be continued for a period of approximately 6 months after appointment of counsel, voluntarily waiving his right to a speedy trial upon that basis. In exchange, the defendant is informed that the successful completion of the program will result in dismissal of the proceedings and an expunging of the record.
The subject juveniles would have this court adopt their reasoning in support of a challenge based upon a violation of equal protection in the implementation of reference procedures. However, that assertion must fail for it would by implication unqualifiedly vitiate these coordinate and constructive community corrections programs upon that same basis. This court will not undertake to limit the effectuation of these procedures.
In United States v. Smith, 354 F.2d 510 (1976), 44 U.S. Law Week 2467, the District of Columbia Court of Appeals reviewed a prosecutorial policy of dismissing charges against nonviolent first-offender misdemeanants upon their waiver of attendant constitutional rights and participation in a pretrial diversionary program. The court concluded that the procedure is neither discriminatory against certain classes of persons for constitutionally impermissible reasons nor a deterrant to the assertion of these rights.
In a similar vein, one appeal raises the question whether a lower court order suggesting the waiver of a right to a speedy trial is an impermissible burden upon the juvenile's exercise of a constitutional right. Although the entire juvenile system involves the waiver of certain constitutional rights in favor of the protection, programs and special features afforded juveniles, any child not wishing to avail himself of this treatment could certainly demand his constitutional right to be, for example, tried by a jury.
Where, as upon one appeal, the juvenile refused to waive a speedy trial and his right of confrontation in favor of an immediate hearing, the juvenile court granted the request. It cannot therefore be concluded that such waivers required as incidents of and prerequisites to the participation in the juvenile justice system have, as contended, a "chilling" effect upon otherwise constitutional procedures.

Standards
Within the legislative scheme, which upon analysis satisfies constitutional standards, the juvenile court is empowered to order reference solely upon its finding "that the child is not suitable to treatment or that the public safety is not served under the provisions of laws relating to juvenile courts." Minn.St. 260.125, subd. 2(d).
*38 The complexity of review of the juvenile court's orders in the individual matters is, in some instances, compounded by a lack of its particular findings of fact upon which the statutory conclusion is based. In those instances, we have relied heavily upon the record to supplement any inadequacy in the court's findings. However, we would preferand think it is the responsibility of the juvenile courtto have orders granting or denying reference accompanied by a sufficient statement of the reasons for and considerations leading to that decision. By this holding, we do not mandate that the statement necessarily meet formal or conventional findings-of-fact requirements. However, the statement should sufficiently demonstrate the court's full investigation of the matter, that careful consideration has led to its decision, and upon which statutory basis the court has relied. Satisfaction of this requirement would afford this court more meaningful review. Kent v. United States, supra.
Minn.St. 260.125 vests in the juvenile court considerable latitude within which it may determine whether to retain jurisdiction over the juvenile or, subject to statutory delimitation, waive that jurisdiction. This substantial discretion presupposes procedural regularity sufficient in each case presented to satisfy the basic requirements of due process and fairness. Therefore, such findings[6] will not be disturbed upon appeal absent a showing that they are "clearly erroneous" so as to constitute an abuse of discretion.[7]
It is noteworthy that in several of the instant cases, the juvenile court expressed substantial and legitimate concern, supported by credible evidence, that specified programs might be instituted by the state Department of Corrections which, were they now in existence, might have rehabilitative facilities to adequately treat specified juveniles. Such concern is no doubt predicated upon its findings pursuant to the remand in In re Welfare of J. E. C., Minn., 225 N.W.2d 245 (1975).
We found in that matter that the record was inadequate to allow resolution of the complex questions presented and therefore remanded the case to the juvenile court to inquire into 
"* * * (1) whether there is presently any program available for treatment for this and other similar juveniles; (2) if no program is available, whether it is feasible and possible to put together an effective program which could treat this and other similar juveniles; (3) if so, why has the Department of Corrections failed to make such a program available? The answer to this question may involve such things as the unavailability of funds, the establishment of priority between programs, and the time it would take to establish such program.
"We think the court should also inquire into the availability of a rehabilitative program for those prosecuted and convicted as adults. In other words, are programs available now for treatment for a person such as appellant under our adult system?" Minn., 225 N.W.2d 253.
Evidence adduced at the remand hearing indicated that the Department of Corrections was unable to successfully treat or rehabilitate all juveniles needing highly secure settings. In essence, the court was presented with scientific evidence and statistical data that treatment of "hard-core juveniles" within the juvenile facilities system was neither effective nor practical. As stated by the Department of Corrections, as amicus curiae:

*39 "Although the evidence, as adduced from psychologists and psychiatrists, demonstrates that treatment methodologies presently extant in correctional systems throughout the country have no predictable probabilities of curbing recidivistic behavior, the Department of Corrections will continue to study and experiment. This experimentation will take place at the state level, and assistance will also be provided at the county level pursuant to the so-called Community Corrections Act. The Department has concluded, based upon experience and upon the opinions of experts, that a separate secure facility for hard-core juveniles would be counter-productive. Thus, in a case where security becomes the paramount concern, reference for adult prosecution is appropriate. Confinement in an adult institution in such cases maximizes both public safety and the possibility for effective rehabilitation."
Such considerations continue to be paramount in this court's resolution of the propriety of orders of the juvenile court either granting or denying motions for reference. We do not undertake to resolve the perplexing issue of whether the juvenile court or this court may direct that the commissioner of corrections establish particular programs[8] which, in these proportionately few cases, would facilitate the goal of rehabilitation.[9] We emphatically invite the legislature to continually reevaluate existing facilities and programs in light of these recurring and unresolved concerns.[10]
We therefore apply the principles announced herein to the individual appeals before us.

In re Welfare of I. Q. S.

In re Welfare of E. T. B.

In re Welfare of T. L. P.
These three matters arise from delinquency proceedings commenced in Hennepin County District Court, Juvenile Division, in which the state has appealed from orders of the juvenile court which denied its motions for referral upon the court's finding that the juveniles were "amenable to treatment within the Juvenile System at programs now available or feasible." Appeal by the state from orders denying motions for reference is permissible pursuant to the standards set forth in Breed v. Jones, supra. Minn.St. 260.291.
Although a review of the record on appeal does not lead to the conclusion that the orders denying the state's motions for referral must be reversed as clearly erroneous, an inconsistency does exist which requires further examination by the juvenile court. Despite the finding that each juvenile was amenable to treatment, in satisfaction of the statutory grounds, the court did not comment upon its former conclusion that each was dangerous. We therefore remand each of the above-entitled matters to the juvenile court for consideration of the risk to public safety which may be occasioned by its decision to retain jurisdiction over the juveniles.

In re Welfare of J. E. C.
We initially considered this case in light of the juvenile court's findings that "no program exists or has been designed which can rehabilitate Respondent, with adequate protection for the public, prior to his twenty-first birthday" and "[h]e is therefore not *40 amenable to treatment as a juvenile and must be referred for prosecution as an adult." We concluded that this finding did not satisfy the standards set forth in Minn.St. 260.125 and remanded the matter to the juvenile court for consideration of, among other factors, (1) whether there is presently any rehabilitative program for treatment of a juvenile such as the subject juvenile, and, alternatively, (2) whether there is available any treatment program for this child within the juvenile system. In re Welfare of J. E. C., supra.
Upon remand, the juvenile court found that no actual or feasible program was available which could protect the public and rehabilitate the child prior to his twenty-first birthday. By order of June 19, 1975, the court directed that the subject juvenile be certified for adult prosecution on the ground that "[t]he public safety requires that the Child be treated as an adult."
As a review of the record evinces sufficient support for these findings, we affirm the order of the juvenile court. As stated above, we invite the legislature's continuing attention to the court's findings regarding the availability and feasibility of correctional programs for its classification of "hard-core" youths in need of secure treatment facilities.

In re Welfare of William Hunter
The subject juvenile in this matter seeks a writ of prohibition restraining the enforcement of the juvenile court's order of reference and the commencement of criminal proceedings against him. He asserts that the court's findings are insufficient to satisfy statutory guidelines for reference and that the order imposes an impermissible penalty upon the exercise of his constitutional right to a speedy trial.
A review of the court's order indicates that it considered both the amenability of the juvenile to treatment and the risk to public safety. While there are not sufficient findings contained within the order to support a determination of the risk to public safety involved, there is adequate evidence in the record to support such a finding.
In In re Welfare of J. E. C., supra, we held that the absence of adequate security programs will not support a finding that the juvenile is not amenable to treatment. However, in the instant case, the juvenile has been the subject of treatment efforts within the juvenile system and has rejected them. It is this rejection of treatment, rather than the absence of adequate security programs, which necessitates his prosecution as an adult for reasons of public safety.
The alleged violation of petitioner's constitutional rights has already been discussed generally. We find that Minn.St. 260.125 does not impose cruel and unusual punishment or an impermissible interference with petitioner's right to a speedy trial. The petition for a writ of prohibition is therefore denied.

In re Welfare of Fred Christopher Romanowski
Upon appeal from an order of reference, this juvenile contends that the juvenile court findings are insufficient to support the order. Rather, he asserts that the evidence strongly supports a finding that he has potential for rehabilitation within the juvenile system. However, the juvenile court specifically found:
"1. Respondent is chronically anti-social, hedonistically concerned with immediate gratification of his wants, by lawful means if possible, otherwise by unlawful means. He is without conscience. He has no need for other persons and resents any intrusion into his life style.
"2. He is unamenable to any known means of socializing therapy.
"3. The prognosis is unacceptably poor for modifying his behavior by a program of security with gradually acquired accountability, or by any other existing or feasible program within the Juvenile Justice System before his twenty-first birthday."
While these findings, standing alone, may not contain sufficient specific facts to support *41 them, the record evinces the juvenile's repeated contacts with the juvenile court upon petitions of delinquency as well as his demonstrated failure to respond to treatment programs.
Therefore, the order of reference for prosecution as an adult is affirmed.

In re Welfare of Donald Amos

In re Welfare of Paul Lawrence Wright
In these two appeals, petitioner juveniles seek a stay of all proceedings commenced after the filing of the orders of referral for adult prosecution. However, as the juvenile court's orders adequately support the decision to refer the juveniles for prosecution as adults, they are affirmed.

State v. Steven Craig Parker
This matter is before us upon the order of the Hennepin County District Court certifying the particular issues as important or doubtful.[11] Rule 29.02, subd. 4, Rules of Criminal Procedure. Defendant asserts the abridgment of his constitutional rights upon the finding of the Ramsey County District Court, Juvenile Division,[12] that he is "not suitable for treatment" within the juvenile system. He concludes that that finding of unsuitability, made prior to any actual attempt to treat him within the system, is violative of due process and equal protection. For reasons stated herein, we are not persuaded by these contentions. Rather, upon review of the memorandum of the juvenile court which accompanied its order of reference dated July 1, 1975, we conclude that the recitation of the juvenile's extensive contacts within the juvenile system, as well as the detailed findings of the court, form a sufficient basis upon which to affirm the court's findings.
As directed above, the cases of I. Q. S., E. T. B. and T. L. P. are remanded for further proceedings consistent with this opinion; the cases of J. E. C., Hunter, Romanowski, Amos, Wright, and State v. Parker are affirmed.
MacLAUGHLIN, Justice (concurring specially).
In 1973 the Minnesota Legislature charged the commissioner of corrections (Minn.St. 242.32) 
"* * * with the duty of developing constructive programs for the prevention and decrease of delinquency and crime among youth and to that end shall cooperate with existing agencies and encourage the establishment of new agencies, both local and state-wide, having as their object the prevention and decrease of delinquency and crime among youth; and the commissioner shall assist local authorities of any county or municipality when so requested by the governing body thereof, in planning, developing and coordinating their educational, welfare, recreational and health activities or other constructive community programs, which have as their object the conservation of youth."
In In re Welfare of J. E. C., Minn., 225 N.W.2d 245, 249 (1975), after observing that "[t]here can be no doubt but what our laws pertaining to the treatment and commitment of juveniles, theoretically at least, are grounded on the theory that appellant, and others like him, have a right to rehabilitative treatment," we raised the question, left unanswered in that case, whether the court can mandate the Department of Corrections to establish a rehabilitative system for the small percentage of juveniles who cannot be rehabilitated under the present programs, but who could be treated, and thereby be saved from referral for adult prosecution, if such a program were available.
We further stated, in J. E. C., Minn., 225 N.W.2d 252:

*42 "* * * [I]t seems that those reported decisions we have support, at least in part [J. E. C.'s], claim that reference as an adult is improper under a situation similar to ours where the finding of lack of amenability to treatment or danger to the public is based upon the correctional authority's failure to provide favorable treatment facilities.
"* * * We might add that there is a difference between placing low priority on programs for hard-core, hard-to-rehabilitate youth and providing no treatment or rehabilitation options at all for such youth."
We remanded the J. E. C. case to the Hennepin County Juvenile Court for the purpose of holding an in-depth hearing to determine Minn., 225 N.W.2d 253 
"* * * (1) whether there is presently any program available for treatment for this and other similar juveniles; (2) if no program is available, whether it is feasible and possible to put together an effective program which could treat this and other similar juveniles; (3) if so, why has the Department of Corrections failed to make such a program available?"
Pursuant to this remand, the juvenile court judge conducted an in-depth hearing and made extensive findings of fact. The court found that no program is presently available in the juvenile system for the treatment of dangerous yet treatable juveniles and that 
"* * * [t]he Commissioner of Corrections has adopted as a deliberate policy that the `"certification" process (treating children as adults) must be used to place the juvenile offender in a secure facility,' clearly intending that this be at St. Cloud. Thus by administrative fiat an appointive official has decided that children over 13 years of age who require security will be locked in long rows of stone and steel cages, mixed with the state's most crime-prone and depraved young adults, freely admitting that their safety cannot be assured. The Commissioner provides no other place of security, thus giving the Courts no other alternative, and then states that he `cannot be held responsible for the generation of any additional commitments' to the prisons."
After an extensive discussion of the problem involved, the juvenile court judge further found:
"* * * It is possible and feasible to devise and emplace [a program for these juveniles], and with the benefits, and protections of the Juvenile Court, using the loss of privileges, of rights, and of liberty itself as the unacceptably unpleasant consequences. Correlated with the provision that the greater the threat the greater the loss of liberty, the program provides a high degree of public safety and, conversely, to change a significant number of Dangerous Youth into a goodly number of law-abiding citizens."
At the same time he emphasized:
"* * * The public is entitled to be protected from dangerous citizens, thus no Dangerous Youth should be released if (a) he is guilty of homicide, robbery, rape, arson, aggravated assault, burglary of an occupied building, or unlawful possession of a gun, and (b) he is found by the Court after hearing to require security due to his proclivity for both violence and running. (c) The public should also be allowed a hearing upon request of the County Attorney whenever it is proposed to give a Dangerous Youth a substantial measure of liberty."
The trial court failed to make specific findings as to why the Department of Corrections has not made such a program available. However, the commissioner of corrections testified at the hearing that his department has studied the question of whether to develop a separate secure facility for the treatment of hard-core youth. Apparently based upon this study he concluded that it would be infeasible to develop such a separate secure facility. The commissioner of corrections testified that the department knew of "no program that will give any sort of guarantee [of successfully rehabilitating these youths]." He also suggested that given the small number of youths involved and the expense of constructing *43 a secure facility it would be economically unsound to develop such a facility, especially in light of the correction department's limited resources and other priorities. The commissioner also contended that Hennepin County could provide its own correctional program if it so chose under the community corrections statute (Minn.St. 401.01 to 401.16).
Both the Hennepin County juvenile court judge, Lindsay G. Arthur, and the commissioner of corrections, Kenneth Schoen, agree there is no alternative to committing certain hard-core dangerous juveniles to the state reformatory in St. Cloud. The difference between the two relates to a relatively small number of dangerous juveniles whom Judge Arthur believes can be rehabilitated, consistent with the purposes and directions of the juvenile court act, if a secure facility is provided for them by the state. This secure facility would be a substitute for placing them in an adult detention facility from which the possibility of their emerging as rehabilitated and useful citizens is not great.
In sum, this case presents a situation where two qualified and knowledgeable individuals in the field of youth correction have studied a complex problem and have arrived at different solutions. This court does not appear to be disposed, at least at this time, to attempt to resolve this dispute through judicial action, and I agree we are not in a position to prudently resolve these difficult questions of fact and policy.
Although I am confident that the commissioner of corrections has acted in good faith, I believe that the importance of this issue and the responsibilities of his office require him to carefully consider the detailed findings and proposals of the exceptionally experienced juvenile court judge of Hennepin County.[1] I also urge that the legislature carefully study this matter with the purpose of deciding whether monies should be appropriated to the commissioner of corrections together with a legislative mandate that the commissioner provide the type of facilities requested by Judge Arthur.
All parties, and the legislature, should recognize the overriding importance of this issue to the youths involved, and to the public at large. It is essential that every step be taken to reach accord as to the best course of action to be followed and that the public good be the only consideration in reaching that accord.
I concur in the holding of the majority opinion.
NOTES
[1] Minn.St. 260.125, subd. 1, provides: "When a child is alleged to have violated a state or local law or ordinance after becoming 14 years of age the juvenile court may enter an order referring the alleged violation to the appropriate prosecuting authority for action under laws in force governing the commission of and punishment for violations of statutes or local laws or ordinances. The prosecuting authority to whom such matter is referred shall within the time specified in such order of reference, which time shall not exceed 90 days, file with the court making such order of reference notice of intent to prosecute or not to prosecute. If such prosecuting authority files notice of intent not to prosecute or fails to act within the time specified, the court shall proceed as if no order of reference had been made. If such prosecuting authority files with the court notice of intent to prosecute the jurisdiction of the juvenile court in the matter is terminated.

"Subd. 2. The juvenile court may order a reference only if
(a) A petition has been filed in accordance with the provisions of section 260.131
(b) Notice has been given in accordance with the provisions of sections 260.135 and 260.141
(c) A hearing has been held in accordance with the provisions of section 260.155, and
(d) The court finds that the child is not suitable to treatment or that the public safety is not served under the provisions of laws relating to juvenile courts.
"Subd. 3. When the juvenile court enters an order referring an alleged violation to a prosecuting authority, the prosecuting authority shall proceed with the case as if the jurisdiction of the juvenile court had never attached."
[2] Minn.St. 260.291, subd. 1, provides: "An appeal may be taken by the aggrieved person from a final order affecting a substantial right of the aggrieved person, including but not limited to an order adjudging a child to be dependent, neglected, delinquent, or a juvenile traffic offender. The appeal shall be taken within 30 days of the filing of the appealable order. The clerk of court shall notify the person having legal custody of the minor of the appeal. Failure to notify the person having legal custody of the minor shall not affect the jurisdiction of the appellate court. The order of the juvenile court shall stand, pending the determination of the appeal, but the reviewing court may in its discretion and upon application stay the order."
[3] Mich.Comp.Laws, § 712A.4 (1970); Mich.Stat.Ann., § 27.3178(598.4) (Supp.1959) provided in pertinent part as follows:

"In any case where a child over the age of 15 years is accused of any act the nature of which constitutes a felony, the judge of probate of the county wherein the offense is alleged to have been committed may, after investigation and examination, including notice to parents if address is known, and upon motion of the prosecuting attorney, waive jurisdiction; whereupon it shall be lawful to try such child in the court having general criminal jurisdiction of such offense."
The Michigan Supreme Court concluded that this statute, even when read within the entire juvenile code, was incapable of application for it essentially provided but one vague standard "subject to so many interpretations as to be no standard at all." People v. Fields, 388 Mich. 66, 76, 199 N.W.2d 217, 222 (1972). Upon rehearing, 391 Mich. 206, 216 N.W.2d 51 (1974), the court held that although the statute was unconstitutionally vague for lack of sufficient standards, that objection had now been overcome by the enactment of a new statute. The prior decision invalidating the statute was to be given only limited retroactivity.
[4] Section 34 of the Uniform Juvenile Court Act provides in part: "* * * [T]he court * * * may transfer the offense for prosecution to the appropriate court having jurisdiction of the offense if:

* * * * * *
"(4) The court finds that there are reasonable grounds to believe that
(i) the child committed the delinquent act alleged;
(ii) the child is not amenable to treatment or rehabilitation as a juvenile through available facilities;
(iii) the child is not committable to an institution for the mentally retarded or mentally ill; and
(iv) the interests of the community require that the child be placed under legal restraint or discipline."
[5] Minn.St. 241.31, 241.32, and c. 401 govern the procedures and qualifications of the community corrections programs.
[6] See, State v. Hogan, 297 Minn. 430, 438, 212 N.W.2d 664, 669 (1973), for a discussion of suggested factors to be considered in determining whether the public safety may be threatened should the reference motion be denied. See, also, In re Welfare of J. E. C., Minn., 225 N.W.2d 245 (1975); Mikulovsky v. State, 54 Wis.2d 699, 196 N.W.2d 748 (1972); and Note, 54 Minn.L.Rev. 389, 402.
[7] See, Rule 52.01, Rules of Civil Procedure; Sappa v. Strite-Anderson Mfg. Co., 300 Minn. 116, 221 N.W.2d 660 (1974); Northern States Power Co. v. Lyon Food Products, Inc., Minn., 229 N.W.2d 521 (1975). See, also, Minn.St. 260.291, subd. 2(a).
[8] See, generally, Minn.St. 242.01, 242.18, 242.19, and 242.32. See, also, In re Welfare of M. D. A., Minn., 237 N.W.2d 827 (1975), for a general elucidation of the relationship of the juvenile court with the Department of Corrections in specified instances.
[9] Statistics supplied by the Department of Corrections of "Juveniles Committed to Adult State Correctional Institutions for the Period July 1, 1969 through June 30, 1975" indicate that for that 6-year period a total of 111 juveniles throughout the state had been certified and committed to adult correctional facilities. Of that total 102 juveniles had been committed to juvenile institutions at some time prior to their certification.
[10] On March 17, 1975, S.F. 904 was introduced which was intended to provide a total program to meet rehabilitative needs of the violent youthful offender. No action was taken upon that bill.
[11] This procedure of certifying the issue as important or doubtful is not necessary to place the reference issue before the court based upon our analysis of "appealability." See, Minn.St. 260.291.
[12] Although the crime alleged in the delinquency petition occurred in Hennepin County, the reference hearing was held in Ramsey County where the juvenile resides. Pursuant to the order of reference, the indictment was filed in Hennepin County.
[1] I note that the Minnesota Department of Corrections stated in its 1975 mission statement that "[t]he Department is committed to a thorough review of [the question of juvenile offenders whose cases indicate that their needs and those of society are best met in high-security settings] and will be developing a separate juvenile mission statement within the next year."