In the Matter of the WELFARE
OF J.D.P., Child.

No. C5-88-2506.

Court of Appeals of Minnesota.

May 9, 1989.

Review Denied June 21, 1989.

C. Paul Jones, State Public Defender, Susan K. Maki, Asst. Public Defender, Minneapolis, for appellants.

Dennis M. Sobolik, Kittson County Atty., Ronald C. Vroom, Assistant County Atty., Hallock, for respondent.

Considered and decided by PARKER, P.J., and RANDALL and KALITOWSKI, JJ., without oral argument.

## OPINION

PARKER, Judge.

Appellant J.D.P., a juvenile, challenges the trial court's decision to refer him to

adult court for prosecution for first-degree murder under Minn.Stat. § 609.185 (1988). We affirm.

## FACTS

The Kittson County Sheriff's Office received a 911 call from J.D.P. on September 15, 1988, at approximately 10:23 p.m. J.D.P. told the dispatcher that he had just shot his mother. Police officers responding found his mother in the kitchen of the family home. She had been shot in the face and was dead.

The investigating officers found J.D.P. at a neighboring house and took him into custody. Upon a court order, Dr. Robert T. Butler, a licensed psychologist who works as the director of the mental health division of Human Services Inc. in Oakdale, Minnesota, conducted an extensive interview with J.D.P. While J.D.P. admitted shooting his mother, he said he did not recall the specifics of the incident. He did recall, however, that on the evening of September 15, he came home from school and completed his farm chores before setting out for a meeting at school. He sought and found his mother at a local tavern in order to get some money from her. She gave him $5. J.D.P. and a friend then purchased a 12–pack of beer. They drank it and went to the meeting. After the meeting, he and his friends bought another 12–pack. By ten p.m., he claims to have drunk ten or eleven beers. He said that he recalls going home and sitting in the kitchen and then fighting with his mother about coming home late; he next recalls being at the neighbor's and calling 911.

On the basis of these facts and the admission by J.D.P. that he shot his mother, the state filed a delinquency petition alleging that he had committed first-degree murder. J.D.P. was 17½ years old at the time of the shooting. The prosecutor moved to have him referred to adult court for prosecution. At the reference hearing Dr. Butler testified extensively regarding what J.D.P. told him about the events, his psychological status, his problem with alcohol dependency, and other pertinent aspects of his family and personal history. The record also contains testimony by representatives of the Minnesota Correctional Facility at Sauk Centre and the Minnesota Correctional Facility at St. Cloud regarding available programs at those facilities and at the juvenile facility in Red Wing.

The trial court found probable cause to believe that the juvenile committed the crime of first-degree murder in violation of Minn.Stat. § 609.185(1), that he was not suitable for treatment, *and* that the public safety would not be served under the provisions of the law relating to the juvenile court.

## ISSUE

Did the trial court err in granting the state's motion to refer J.D.P. for prosecution as an adult for first-degree murder?

## DISCUSSION

In order to refer a minor for adult prosecution, the trial court must find (1) probable cause to believe the child committed the offense alleged in the delinquency petition, and (2) a demonstration by clear and convincing evidence that the minor is not suitable to treatment or that the public safety is not served under the provisions of the law relating to juvenile courts. Minn. Stat. § 260.125, subd. 2(d) (1988). A prima facie case that the minor is not suitable for treatment or that the public safety is not served is established by the state if the minor was at least 16 years old at the time of the alleged offense, and either of the following is established: (1) the juvenile is alleged by the delinquency petition to have committed an aggravated felony against the person and in committing the offense acted with particular cruelty or disregard for the life or safety of others, or the offense involved a high degree of sophistication or planning; or (2) the juvenile is alleged by the delinquency petition to have committed murder in the first degree. Minn.Stat. § 260.125, subd. 3 (1988).

The trial court's decision will not be upset unless its findings are so clearly erroneous as to constitute an abuse of dis-

cretion. *In Re Welfare of I.Q.S.*, 309 Minn. 78, 86–87, 244 N.W.2d 30, 38 (1976). For purposes of the reference hearing, the charges against the juvenile are presumed to be true. *In Re the Welfare of W.J.R.*, 264 N.W.2d 391, 393 (Minn.1978).

■ On this record, we cannot say that the trial court clearly erred in its decision to refer J.D.P. for prosecution as an adult. There was abundant evidence to constitute probable cause that he committed first-degree murder, and he did not rebut this showing. Not only is J.D.P. alleged to have committed murder in the first degree, but the record supports the trial court's finding of an aggravated felony committed with particular cruelty and disregard for the life of another.

■ The trial court also made extensive findings pursuant to subdivision 2 of the reference statute to demonstrate that J.D. P. was not suitable to treatment *and* that public safety would not be served under the juvenile system. J.D.P. was 17–½ years old at the time of the homicide. While Dr. Butler's testimony contains support for the positions of both the state and the juvenile, he ultimately perceived the major problem to be severe alcohol dependency. Violence is clearly associated with J.D.P.'s intoxication and pattern of chemical dependency, as is a pattern of losing emotional control and experiencing blackouts while under the influence of alcohol. While Dr. Butler indicated that the remaining 17 months of juvenile court jurisdiction could be a sufficient amount of time in which to *address* the chemical dependency problem, he also stated that chemical dependency involves a lifelong recovery process:

> On a more negative side, recovery from chemical dependency is never an easy matter and especially in a person with as extensive a family history of chemical dependency as appears to be in [J.D.P.'s] family. Moreover, [J.D.P.] would appear to be quite vulnerable to the use of alcohol in that his chemical dependency progressed from early experimentation to seriously harmful dependency in a matter of a few short years and thus, would

appear that its power for him may be fairly strong and difficult to give up. (Dr. Butler's written report, at 17).

The record also contains evidence regarding programs available at the juvenile correctional facilities at Sauk Centre and Red Wing. Testimony indicates that neither is a secure facility and neither has sufficient in-house counseling to help J.D.P. deal with his chemical dependency and emotional problems in the 17 months remaining of juvenile court jurisdiction. Clear and convincing evidence thus exists to support the trial court's decision that both public safety concerns and unsuitability to available treatment within the juvenile system mandate reference to adult court.

■ The juvenile may rebut a prima facie case if he shows by *significant evidence* that he is suitable for treatment or that public safety is served under the provisions of laws relative to juvenile courts. *Matter of the Welfare of J.L.B.*, 435 N.W. 2d 595, 598 (Minn.Ct.App.1989). If the trial court concludes that the juvenile has rebutted the prima facie showing, then the court must analyze the reference request based on *the entire record,* without reference to the prima facie case, and consider whether the state has met its burden of proving by clear and convincing evidence that the juvenile is unamenable to treatment in the juvenile court system consistent with public safety. *Matter of the Welfare of D.F.B.*, 433 N.W.2d 79, 81 (Minn.1988); *Matter of the Welfare of J.F.K.*, 316 N.W.2d 563, 564 (Minn.1982). This review of the entire record is to involve the multifactor analysis discussed in *Matter of the Welfare of Dahl*, 278 N.W.2d 316 (Minn.1979), and the totality of the circumstances factors set forth in Minn.R.Juv.Ct. 32.05, subd. 2. *Matter of D.F.B.*, 433 N.W.2d at 81.

There is support in the record for the dissent's conclusion that J.D.P. has rebutted the prima facie case, and we view this as a close question. Dr. Butler's report is equivocal and could be interpreted as supporting a rebuttal, particularly with regard to amenability to treatment. Fortunately, however, the trial court did not stop with the prima facie showing but went on to

apply the totality of the circumstances test as set forth in Minn.R.Juv.Ct. 32.05, subd. 2.

The trial court's memo discusses the age of the juvenile and his state of intoxication at the time of the alleged offense. The court also notes the seriousness of the offense, that the juvenile acted in disregard of the safety and life of his mother, that he must have been able to foresee the consequences of his act, and that he had an opportunity to reflect on this when he went to get his shotgun. The trial court also questioned whether 17 months was sufficient time for treatment, observing that J.D.P.'s treatment for alcohol dependency is going to be a lifelong process and that facilities available in the juvenile system are lacking in both security and chemical dependency programs. We cannot say on the basis of this thorough and thoughtful analysis that there was clear error on the part of the trial court. Based on Dr. Butler's somewhat equivocal testimony and factors beyond the age of the offender and the heinous nature of the offense, the state met its burden of proving by clear and convincing evidence that J.D.P. is unamenable to treatment in the juvenile court system consistent with public safety. *See Matter of D.F.B.*, 433 N.W.2d at 81–82.

## DECISION

The trial court did not err in granting the state's motion to refer the juvenile for prosecution as an adult.

Affirmed.

RANDALL, Judge, dissenting.

I respectfully dissent. I agree with the majority that the trial court did not err in finding probable cause to support the allegation J.D.P. committed murder in the first degree, but the discussion does not end there. I find the facts in this case controlled by the supreme court case of *In re Welfare of D.F.B.*, 433 N.W.2d 79 (Minn. 1988). I find that pursuant to the standards established in *D.F.B.*, the juvenile here easily produced significant or substantial evidence rebutting the prima facie case.[1] *Id.* at 81.

The majority quoted but a small portion of Dr. Butler's written report. The specific conclusions of the court appointed examiner, Dr. Butler, on amenability to treatment can, with objectivity, be characterized only as positive and favorable to the juvenile's position.[2] On the other prong, which is public safety, Dr. Butler's report again is favorable to the juvenile.[3]

I find that the trial court clearly erred in its conclusion that J.D.P. did not rebut the state's prima facie showing of unamenability to treatment in the juvenile system and of danger to public safety if treated under provisions of juvenile court law. Thus, pursuant to the holding of *D.F.B.*, when the state's prima facie case is rebutted, the court must decide on the basis of the entire record, without reference to the prima facie case, whether the state has met its burden of proof of a need for certification by clear and convincing evidence. *Id.* at 81. Contrary to the majority, I find that the state did not meet its burden.

*D.F.B.* tells us that the offense by itself does not justify reference.[4] I sympathize with the trial court which was looking at J.D.P.'s age and the small amount of time before his 19th birthday, at which time the juvenile court loses jurisdiction. However, that shortness of time is the fault of the law regarding juvenile court jurisdiction, not the fault of the juvenile. The trial court here in its lengthy memorandum supporting certification cut through all the smoke and stated its honest reasons why it referred this juvenile for prosecution as an adult.

1. I do not dispute that a prima facie case was established. Minn.Stat. § 260.125, subd. 3(2) (1988).

2. The report is lengthy, and its support for this dissent cannot effectively be worked into an argument without an entire reprint which is attached.

3. Report on "dangerousness" attached.

4. "[W]e do not agree with the implication that reference is justified any time a juvenile commits a heinous offense." *D.F.B.*, 433 N.W.2d at 81.

The murder of any person deserves more than 17 months of control, if referral is not made, the court is doing little to punish a person for such seriousness of an offense; to deter others from committing murder; and rehabilitating the offender. The court concludes that the child be referred for adult prosecution.

The problem is that although those reasons are practical, they are in direct opposition to the law on certification. As *D.F.B.* pointed out, the seriousness or heinousness of the offense, in and of itself, is not the sole standard for reference. Also, there is nothing in the law of certification which talks about "deterrence to others." The culprit here, as the majority acknowledges, although it affirmed certification, is juvenile court jurisdiction ending at age 19.

Prior to 1977, courts could retain custody over juvenile offenders until they reached age 25. Minn.Stat. § 242.27 (1971), repealed by 1977 Minn.Laws ch. 392, § 14. Beginning in 1977, the maximum age for juvenile court jurisdiction was 21 years, and this was reduced to 19 years in 1982. 1982 Minn.Laws ch. 615, § 4. If the legislature would again extend the juvenile court's control to some age between 19 and 25, the practical problem encountered in formulating a reasonable juvenile disposition for appellant would be mitigated. The juvenile court would have a reasonable number of years to monitor whatever treatment was ordered, and the longer jurisdiction would help alleviate public concerns that juveniles who commit serious crimes are released too quickly. There is a pronounced need for such legislation.

The existing law affects not only J.D.P., but every juvenile who has attained the age of 16. Court ordered treatment does not begin until the entire process of certification, including appeal to this court and further discretionary review by the supreme court, is completed. The time intervals outlined in this case are typical. At the time Dr. Butler made his assessment, he envisioned 17 months of juvenile court jurisdiction. Even that span of time, arguably too short, is no longer available. Appellant turned 18 on March 17, 1989. By the time

this opinion is released, there will be less than ten months left until his 19th birthday. Those remaining months of jurisdiction will be cut in half if supreme court review is sought, and further review is a reasonable probability in a case so serious.

Frankly, even if an alleged offense is committed on the juvenile's 16th birthday, by the time the prosecution and defense have adequately prepared their cases for certification, and by the time all appellate routes, even if expedited, are exhausted, a year or more could easily elapse, and that cuts into needed treatment time. For all practical purposes, 16 year old juveniles who successfully resist certification, have a maximum of two years, and often less, of juvenile court treatment. *Even when an offender is admittedly amenable to treatment in the juvenile system, competent expert evidence may state two years is too short.* That produces the no-win situation we have here. If J.D.P. is ultimately found unamenable to treatment, it is only because of the legislative cutoff at age 19, not because of J.D.P. The ultimate difference to a juvenile such as J.D.P. is overwhelming. If he is treated within the juvenile system, his sentence will be a matter of several months. If he is found guilty of murder in the first degree as a certified juvenile, he may do a mandatory 25 years incarceration, minus good time. Minn.Stat. § 243.05, subd. 1(b) (1988).

Even with thoughtful, compassionate trial judges attempting to follow the letter and the spirit of the law on certification, the practical knowledge that treatment in the juvenile system ends within a matter of a few months to a few years at best, has to impermissibly weigh on the side of certification even when, as I find here, amenability to treatment and lack of dangerousness to the public is supported by the record.

I dissent and would reverse the trial court and remand for a continuation of juvenile court proceedings.

### 2. *Treatability*

The present evaluation concludes that the emotional and psychological problems from which [J.D.P.] suffers, are

treatable. The evaluation reveals several features which would indicate a hopeful prognosis in terms of psychological treatment. First, the primary problem which is revealed in the present evaluation is chemical dependency, and [J.D.P.'s] anger and loss of emotional control would appear to be clearly associated with the chemical dependency. Chemical dependency is a treatable disorder and there are support networks available through Alcoholics Anonymous for persons recovering from chemical dependency which is often associated with a healthy recovery.

Second, the present evaluation does not reveal any pervasive hatred toward other persons; and [J.D.P.] does not appear to be the angry, bitter adolescent hating all authority and the world in general. There is no evidence of an anti-social personality disorder or a generalized anger and rage toward others.

Third, there is no evidence of any childhood anti-social behavior; and to the contrary, there is evidence of a general pattern of responsibility, obedience and normally developing conscience.

Fourth, [J.D.P.] appears to have some clearly articulated goals in terms of his career ambitions, and is able to project himself into the future and work toward those goals. He does not appear to be an alienated "disaffiliated" young man, but rather appears to have some age-appropriate goals and motivation.

Fifth, he has established what appears to be normal age-appropriate social relations with male friends as well as girl friends, and has apparently reached out to a neighbor family who he has in some ways "adopted" as his own. Thus, he would appear to have both the capacity and the interest in forming good relationships with others and is not an isolated, detached individual.

Finally, there are some indications in the present evaluation that [J.D.P.] recognizes the presence of a problem with his chemical dependency and is motivated to change. He indicates that there were several times during this past summer when he attempted to control his drinking, and during my evaluation with him he indicated that he believed he has a problem with chemical abuse. The first step toward recovery is admitting the presence of a problem and there is some hopefulness in this aspect of [J.D.P.'s] present statements.

On a more negative side, recovery from chemical dependency is never an easy matter and especially in a person with as extensive a family history of chemical dependency as appears to be in [J.D.P.'s] family. Moreover, [J.D.P.] would appear to be quite vulnerable to the use of alcohol in that his chemical dependency progressed from early experimentation to seriously harmful dependency in a matter of a few short years and thus, it would appear that its power for him may be fairly strong and difficult to give up. Second, the history of violence in the family and poor relations with his parents and siblings would suggest that he may have difficulty in forming an effective family of his own. Family patterns of interpersonal relationship are often passed from generation to generation and certainly [J.D.P.] has not had a healthy pattern to learn from. He does not appear to have healthy ways of dealing with conflict and has used drinking as an escape. Moreover, he does not appear to have effective ways of expressing himself directly and easily and has used drinking as a prop.

Appropriate treatment for [J.D.P.] should address his chemical dependency problems first. In addition to this he will need to develop appropriate methods of being expressive and assertive, particularly around issues of his own feelings and interpersonal conflicts. Treatment should also address issues associated with the family patterns described in [J.D.P.'s] family. [J.D.P.] will need to come to an effective and appropriate understanding of his mother's behavior and the behavior of others in his family. It is likely that he has incorporated many aspects of the family functioning into his own identity which has resulted in some self-blame, lowering of self-esteem, inef-

fective ways of dealing directly with problems, including blaming and avoidance. It is suggested that his "familial/emotional schooling" and alcoholic/abusive family has left him ill prepared to deal with adult life.

With regard to the question of whether or not the juvenile system is recommended as appropriate for [J.D.P.], the present evaluation can address this question in terms of the potential treatment effect or rehabilitation effect one might expect given the limited time which [J.D.P.] would be kept in the juvenile system. If assumed that he would be kept in the juvenile system until his nineteenth birthdate that leaves approximately seventeen months for any treatment program to do its work and have any impact on [J.D.P.]. At this point it would appear that one is dealing in probabilities, i.e. the probability that an effective treatment program could have an impact in this period of time. Based on the considerations outlined above it is suggested that [J.D.P.] is a good candidate for a treatment/rehabilitation program and that the juvenile system would have more than a 50/50 chance of effectively treating the problems which [J.D.P.] presents. While there would certainly be gains to be made in a longer program, it is expected that seventeen months would provide sufficient time to address the primary problems outlined in this report. It is also to be expected that there are other problems which would persist after this seventeen month period and would likely require therapeutic attention, namely, chemical dependency which is a life-long recovery process and also coming to some emotional grips with his family relationships. The shooting of this mother is also an event which will require therapeutic attention beyond his nineteenth birthday.

It should also be noted that the clinical history and picture presented by [J.D.P.] also suggests that he is a candidate for a major depressive episode should his built up resentment and anger, which had previously been directed toward his mother, now become directed toward himself.

He certainly has external justification for becoming depressed and has some history of becoming suicidal. Therefore, it is the conclusion of this report that he represents some risk to develop a depressive reaction within the next year or so which could also carry suicidal risk.

In summary, the present evaluation concludes that the problems which [J.D.P.] exhibits at a psychological level are treatable and there are some hopeful signs for this treatment. Because of the seriousness of the offense for which he is charged and concerns about his past suicidal behavior it is recommended that this treatment occur in a secure setting. The most difficult question to address related to his treatability relates to the estimated length of time necessary for [J.D.P.] to recover from these problems. Treatment within the juvenile system is time limited and [J.D.P.'s] awareness of this time limitation could adversely impact on the effectiveness of that therapy. However, the chemical dependency problem and other problems indicated in the present evaluation are certainly such as can usually be treated within a seventeen month period.

Robert T. Butler, Ph.D.
Licensed Consulting Psychologist
Director, Mental Health Division

### 3. *Dangerousness*

The present evaluation does not reveal any homicidal tendencies on [J.D.P.'s] part or immediate likelihood that he will engage in seriously harmful conduct. It should be pointed out, however, that the full impact and consequences of his recent behavior has not yet been experienced by [J.D.P.], and his past history of considering suicide would suggest a cautionary note in this regard. The shooting incident with his mother is associated with the patterns previously described, and yet somehow seems to stand outside of a full and complete explanation. Certainly there are chemically dependent adolescents with alcoholic and abusive mothers, who do not shoot them. Thus, the question must be raised as to wheth-

er or not there is something about [J.D.P.] himself that is more dangerous or pathological than is immediately apparent.

The present evaluation concludes that the shooting represents an unfortunate, violent consequence of the processes previously outlined. There is nothing in the present evaluation to suggest a pattern of violent behavior. There is nothing in the present evaluation to suggest pervasive anger and hatred directed towards persons other than his mother. The evaluation does suggest a deteriorating course of chemical dependency which, when associated with the escalating conflicts with his mother, led to increasing loss of emotional control.

It can, perhaps be predicted that without treatment for chemical dependency [J.D.P.] would continue to develop a pattern of losing emotional control following excessive drinking, and perhaps a pattern of anger and violence in response to life's stresses and frustrations. This potential anger and violence, however, must be seen as a generalized aspect of [J.D.P.'s] behavior when he is intoxicated, based on examples from his behavior over the past summer, and it is not based on any specific threats or clinical impressions that he is dangerous or violent. If [J.D.P.] is successful in completing a program of treatment for chemical dependency and is successful in remaining free of mood altering chemicals, the degree of likelihood that he will engage in seriously harmful conduct is judged to be quite low.