## IN RE WELFARE OF J. E. C. v. STATE.

225 N. W. 2d 245.

January 3, 1975—No. 45033.

*James J. Krieger,* Legal Rights Center, Inc., for appellant.

*Warren Spannaus,* Attorney General, *Gary W. Flakne,* County Attorney, and *Vernon E. Bergstrom, David W. Larson,* and *Michael McGlennen,* Assistant County Attorneys, for respondent.

KNUTSON, JUSTICE.*

This is an appeal from an order of the Hennepin County District Court, Juvenile Division,[1] referring appellant for prosecution as an adult. Appellant was charged by petition in juvenile court with delinquency for aggravated robbery on January 18, 1974. Motion was made to refer appellant to the district court for adult prosecution. The juvenile court referee granted the motion on January 30, 1974, and on appeal was affirmed by the judge of the juvenile court.

Appellant in this case was accused of robbing three persons of a watch, $4.50, and $34 in food stamps at gunpoint.

Appellant was born on September 24, 1956, thus making him 17 years of age at the time of the alleged offenses. He has a long history of involvement with juvenile authorities, running back

---

* Retired Chief Justice acting pursuant to Minn. St. 2.724.

[1] In Hennepin County, the judge of the juvenile court is a judge of the district court assigned to the juvenile division.

to 1966, at which time he was 10 years old. We do not see that any good purpose could be served by detailing the many offenses for which he has been charged. They range from minor offenses to some quite serious.

The evidence at the reference hearing consisted almost entirely of the testimony of Dr. James Gilbertson, chief psychologist at the Metropolitan Training Center at Lino Lakes. The conclusion reached from Dr. Gilbertson's testimony is that there is at the present time no program specifically designed for hard-core, sophisticated, aggressive delinquents, comprising about 10 percent of juvenile offenders, and that the present available programs are not suitable for handling such cases, including that of appellant. Dr. Gilbertson testified that all treatment options currently available were designed for short-term treatment and were not suitable for a person having the past record of appellant. In his opinion, appellant is dangerous and is capable of killing someone.

Dr. Gilbertson further testified that the CCR[2] program would

[2] CCR is an acronym for "Contracting for Community Reintegration." The program was written, developed, and staffed by employees of the Metropolitan Training Center at Lino Lakes. During the institutionalization phase of the program, youths committed to it were housed at Kellogg Cottage, a facility located on the Lino Lakes grounds, but physically separated from the Metropolitan Training Center. The other two phases of the program, a halfway house and high-density surveillance probation, were apparently never implemented, as the program was terminated at the end of the 1972-1973 fiscal year, approximately 8 months after it had begun, for want of funds. During that 8-month period the institutional phase of the program appears to have been financed as a part of the Metropolitan Training Center's regular budget, but special funding was needed to fully implement the program and to operate it on other than a pilot basis. The Department of Corrections did include the CCR program among the programs listed in its Comprehensive State Plan which accompanied its application for a Law Enforcement Assistance Administration grant for correctional facilities. See, 42 USCA §§ 3750a and 3750b. Nevertheless, the department assigned such a low priority to the program that it received no part of the L.E.A.A. grant.

have been the treatment of choice for appellant if he could design the optimal program. The CCR program had three phases—a security institutional phase, a community residence phase, and a highly supervised parole phase. According to Dr. Gilbertson, the advantage of the CCR program is that it would not permit a juvenile's behavior to slide. During the first phase, it would provide high security; during the second, it would provide a highly structured and supervised environment to ease the transition back to the community; and during the third phase, it would provide high-density surveillance by parole officers and would permit immediately returning the juvenile to an institution in the event of a violation of parole. Thus, according to Dr. Gilbertson, the public is protected and the juvenile's behavior problem treated. While he predicted that this program probably could not cure appellant, it would be a successful management tool. He estimated that the program generally would have a 75 percent success rate.

Appellant had been committed to the CCR program in August 1973, but it had been terminated for lack of funding shortly thereafter. Thus, he was released on ordinary parole rather than to a community residence. The reasons for termination of the program were lack of funds due to the low priority given the program by the Department of Corrections and the difficulty in establishing community residences due to neighborhood resistance to placement of such "halfway houses."

Dr. Gilbertson could only speculate as to what the Department of Corrections would do with appellant if he were adjudged delinquent by the juvenile court, but was of the opinion that the treatment would be similar to that he underwent in the summer of 1973 with rapid release after a short period of incarceration. He was of the opinion that it would require approximately 2 years for appellant to complete the entire CCR program if it were available and estimated that it would require approximately a year for the Department of Corrections to reinstate the pro-

gram. He estimated that the cost of the program would be approximately $300,000.

It appears that there is no treatment available for appellant if he is sent to the St. Cloud Reformatory.

Our statute, Minn. St. 260.125, dealing with reference by a juvenile court for adult prosecution, provides:

"Subdivision 1. When a child is alleged to have violated a state or local law or ordinance after becoming 14 years of age the juvenile court may enter an order referring the alleged violation to the appropriate prosecuting authority for action under laws in force governing the commission of and punishment for violations of statutes or local laws or ordinances. The prosecuting authority to whom such matter is referred shall within the time specified in such order of reference, which time shall not exceed 90 days, file with the court making such order of reference notice of intent to prosecute or not to prosecute. If such prosecuting authority files notice of intent not to prosecute or fails to act within the time specified, the court shall proceed as if no order of reference had been made. If such prosecuting authority files with the court notice of intent to prosecute the jurisdiction of the juvenile court in the matter is terminated.

"Subd. 2. The juvenile court may order a reference only if

(a) A petition has been filed in accordance with the provisions of section 260.131

(b) Notice has been given in accordance with the provisions of sections 260.135 and 260.141

(c) A hearing has been held in accordance with the provisions of section 260.155, and

(d) The court finds that the child is not suitable to treatment or that the public safety is not served under the provisions of laws relating to juvenile courts.

"Subd. 3. When the juvenile court enters an order referring an alleged violation to a prosecuting authority, the prosecuting authority shall proceed with the case as if the jurisdiction of the juvenile court had never attached."

In denying appellant's motion that the court order the Department of Corrections to establish a program suitable for treating appellant and those similar to him and in referring him for adult prosecution, the juvenile court referee said:

"In Joe's case I don't think he's got a chance at Lino because of his age. I don't think they can implement a program, utopian type of thing that Dr. Gilbertson is talking about. I wish they could. If they could do it tomorrow or the next day I would have no hesitancy in referring Joe to that program. Unfortunately, I see no such program in existence. Even the authority to direct the creation of such a program by the Court is being challenged. So, no way do I see Joe going back to Lino, getting released in two months, and being out on the streets again and sliding and slide. That's where I think I have to draw the line. Perhaps through the appeals that are coming forth some of this may be brought to the attention of the public. Such as this contract violation. It was not a unilateral contract it was bilateral. I think the legislature could and should take a good hard second look at the makeup of the Department of Corrections and also the structure of the laws pertaining to juveniles and the facilities available to them. There is no secure juvenile setting in this state that I'm aware of and what Joe needs is security. He needs rehabilitation. I can get security for him and perhaps fifty percent chance of rehabilitation through a reference. If I send him back to Lino right now, I get neither one basing my opinion on what Dr. Gilbertson has just testified to. So, that's the basis for my opinion and my decision."

In affirming the referee's recommendation, the juvenile court judge said:

"The record supports the finding of the Referee that no program exists or has been designed which can rehabilitate Respondent, with adequate protection for the public, prior to his twenty-first birthday. He is therefore not amenable to treatment as a juvenile and must be referred for prosecution as an adult."

The reasons assigned by the juvenile court for reference to adult prosecution fall short of the statutory requirement of § 260.125, subd. 2(d). The absence of rehabilitative facilities to treat appellant may not mean he is not amenable to treatment as a juvenile if such facilities were available.

The crucial question then in this case is whether the court may refer appellant for adult prosecution for the reason that "no program exists or has been designed which can rehabilitate Respondent, with adequate protection for the public, prior to his twenty-first birthday." In other words, is this reason sufficient to sustain the conclusion that appellant "is therefore not amenable to treatment as a juvenile and must be referred for prosecution as an adult"?

There can be no doubt but what our laws pertaining to the treatment and commitment of juveniles, theoretically at least, are grounded on the theory that appellant, and others like him, have a right to rehabilitative treatment. Appellant relies on Minn. St. 242.01 and 242.32, which provide in relevant part:

§ 242.01:

"The purpose of Minnesota Statutes, Chapter 242, is to protect society more effectively by providing a program looking toward prevention of delinquency and crime by educating the youth of the state against crime and by substituting for retributive punishment methods of training and treatment directed toward the correction and rehabilitation of young persons found delinquent or guilty of crime."

§ 242.32:

"The commissioner of corrections shall be *charged with the duty* of developing constructive programs for the prevention and decrease of delinquency and crime among youth and to that end shall cooperate with existing agencies and encourage the establishment of new agencies, both local and state-wide, having as their object the prevention and decrease of delinquency and crime among youth; * * *." (Italics supplied.)

Appellant also relies on Minn. St. 242.18 and 242.19, which appear to require the Department of Corrections to make good-faith efforts to rehabilitate children adjudged delinquent. They provide in relevant part:

§ 242.18:

"When a person has been committed to the authority or the commissioner of corrections, the authority or the commissioner of corrections under its rules shall forthwith cause him to be examined and studied, and investigate all of the pertinent circumstances of his life and the antecedents of the crime because of which he has been committed to it, and thereupon order such treatment as it shall determine to be most conducive to the accomplishment of the purposes of chapter 242."

§ 242.19, subd. 2:

"When a child has been committed to the commissioner of corrections by a juvenile court, upon a finding of his delinquency, the commissioner may for the purposes of treatment and rehabilitation:

(a) order his confinement to the state training school, Minnesota home school or the Minnesota metropolitan training center, and such institutions shall accept such persons so committed to them, or to a group foster home under the control of the commissioner of corrections, or to private schools or institutions established by law or incorporated under the laws of this state that may care for delinquent children;

(b) order his release on parole under such supervisions and conditions as the commissioner believes conducive to law-abiding conduct, treatment and rehabilitation;

\* \* \* \* \*

(e) discharge the child from his control when he is satisfied that the child has been rehabilitated and that such discharge is consistent with the protection of the public."

We cannot help but sympathize with a judge of the juvenile court who has tried conscientiously to find a solution to the vex-

ing problem of what to do with this small minority of hard-core juveniles who cannot be corrected under our present facilities and for whom there are no other adequate facilities. In the case of Welfare of A. L. J. v. State, 300 Minn. 542, 220 N. W. 2d 303 (1974), the juvenile court of Hennepin County, with the same judge presiding as is involved in this case, refused to refer a juvenile for adult prosecution. In dismissing the appeal, we said:

"* * * The juvenile court, upon findings that respondents were amenable to rehabilitation treatment within the juvenile justice system if an 'intensive accountability treatment' program were established by the Department of Corrections, denied the motions for referral." 300 Minn. 543, 220 N. W. 2d 304.

We dismissed the state's appeal on the grounds that the case was not ripe for decision because there had been no final order made by the juvenile court either of delinquency or of referral.

In the present case, the court referred the juvenile for adult prosecution, as we have said, because "no program exists or has been designed which can rehabilitate Respondent, with adequate protection for the public, prior to his twenty-first birthday." Thus the juvenile court was left with the dilemma in both cases of what to do with a juvenile who cannot be rehabilitated under existing facilities and for whom there are no other facilities now available.

It appears that the juvenile court has under these circumstances only two alternatives, namely, to retain jurisdiction over him as a juvenile, with the knowledge that no matter what action is taken the offender will soon again be turned loose on society to continue his depredations, or to refer him as an adult for prosecution and probably subject him to a lengthy sentence with doubtful rehabilitative sources available.

The question confronting us is: What power do the courts have to solve this problem? We can, to be sure, refuse to permit reference for adult prosecution, but is the welfare of society served by temporarily restraining him under a juvenile court system

where the best hope will be that he will soon be turned loose again to prey on society? Can the courts mandate the Department of Corrections to establish a rehabilitative system for this small percentage of juveniles who cannot be rehabilitated under our present program? If we cannot mandate such action, we can at least urge that an examination be made of it by the authority which can establish such a system. This court has never squarely faced the issue of whether our statutes which grant a juvenile a right to treatment limit the discretion of the court to refer for adult prosecution a juvenile who cannot be treated under existing facilities but who could be treated if adequate facilities were provided. We have imposed some limitations upon the court's right of reference and have held that the juvenile court may properly take into account available facilities. In State v. Hogan, 297 Minn. 430, 438, 212 N. W. 2d 664, 669 (1973), we said:

"In determining if the public safety would be threatened, among the relevant factors to be considered are: (1) The seriousness of the offense in terms of community protection; (2) the circumstances surrounding the offense; (3) whether the offense was committed in an aggressive, violent, premeditated, or willful manner; (4) whether the offense was directed against persons or property; (5) the reasonably foreseeable consequences of the act; and (6) the absence of adequate protective and security facilities available to the juvenile treatment system. See, Mikulovsky v. State, 54 Wis. 2d 699, 196 N. W. 2d 748 (1972); Note, 54 Minn. L. Rev. 389, 404 (1969)."

While there is not much authority on the subject, other courts have struggled with this issue in a limited way. See, e.g., In re Anonymous, 14 Ariz. App. 466, 484 P. 2d 235 (1971); In re Appeal of Maricopa County, 18 Ariz. App. 560, 504 P. 2d 501 (1972); Harvin v. United States, 445 F. 2d 675 (D. C. Cir. 1971); United States v. Matthews, 480 F. 2d 1191 (D. C. Cir. 1973); United States v. Tillman, 374 F. Supp. 215 (D. D.C. 1974);

United States v. Alsbrook, 336 F. Supp. 973 (D. D.C. 1971); United States v. Lowery, 335 F. Supp. 519 (D. D.C. 1971).

In the case of United States v. Tillman, *supra,* the facts are quite similar to those involved in the case before us. The rationale of the court is helpful. The young offender in that case was accused of murder and had a past record similar to that of appellant. The classification committee report established that he, like appellant, needed long-term treatment in a secure environment, treatment which the existing facilities apparently could not provide. In rejecting the lack of facilities as a proper basis for adult sentencing, the court stated:

"The picture which emerges is that the Lorton Youth Center, because of its limited capacity, has been oriented to provide only short term treatment (i.e., less than two years) and offenders who require treatment for longer periods are likely to be rejected for that reason. In the defendant's case, he was rejected not because he would not benefit from YCA treatment, but because he needed more treatment than the Lorton Youth Center staff felt it could provide.

"* * * [T]here is no legal authority to deny an eligible offender a Youth Act sentence because of the inability of the correctional institutions to provide treatment contemplated by the Act. If the Lorton Youth Centers cannot, as a practical matter, accommodate offenders with long term treatment needs, there appears to be no legal obstacle to prevent cooperation in this regard between Lorton and the Federal Bureau of Prisons, which does have long term treatment programs." 374 F. Supp. 223.

With respect to the second statement of the juvenile court—that appellant would attain an age where the juvenile court no longer had jurisdiction before he could be rehabilitated—a number of authorities approve reference. See, H. v. Superior Court of Los Angeles County, 3 Cal. 3d 709, 478 P. 2d 32, 91 Cal. Rptr. 600 (1970); P. H. v. State, 504 P. 2d 837 (Alaska 1972); In re Appeal of Maricopa County, 18 Ariz. App. 560, 504 P. 2d 501

(1972). But, cf., United States v. Waters, 437 F. 2d 722 (D.C. Cir. 1970).

There seem to be no reported decisions on the question of whether reference is proper where the lack of time to rehabilitate the offender stems from the fact that it would be necessary to implement a program before rehabilitation could begin and that time would place the offender beyond the reach of the juvenile court.

Thus, while the authorities are limited, it seems that those reported decisions we have support, at least in part, appellant's claim that reference as an adult is improper under a situation similar to ours where the finding of lack of amenability to treatment or danger to the public is based upon the correctional authority's failure to provide favorable treatment facilities.

Nor does respondent dispute apppellant's assertion that he has a right to treatment. Instead, it argues that it is within the discretion of the Department of Corrections to allocate available funds among its various programs on the basis of likelihood of success and that, thus, it may give programs designed for the 10 percent of juvenile offenders who can be labeled "hard-core" lowest priority. We might add that there is a difference between placing low priority on programs for hard-core, hard-to-rehabilitate youth and providing no treatment or rehabilitation options at all for such youth.

The record in this case is not adequate to permit us to decide whether appellant may insist upon treatment as a juvenile before being referred for adult prosecution. No evidence was received from persons in positions of administrative authority in the Department of Corrections, from persons who plan programs, or from persons who have the ultimate power to decide what type of treatment would be provided to appellant were he committed to the commissioner as a delinquent. Dr. Gilbertson could only speculate as to what the department's course of conduct might be were it faced with such a commitment. Even though CCR in this state has been discontinued, it might be possible that the de-

partment could provide appellant with rehabilitative care in a secure setting through other programs.

The complexity of the problem of what right a juvenile has to treatment and the problems affecting treatment of juveniles generally has recently been discussed in several articles in a symposium on "Juveniles and The Law," 12 American Cr. L. Rev. See in particular, Wald and Schwartz, *Trying a Juvenile Right to Treatment Suit: Pointers and Pitfalls for Plaintiffs,* 12 American Cr. L. Rev. 125, 163:

"Juvenile right to treatment suits are time-consuming, difficult, and unpredictable undertakings. The parameters of adequate treatment are inexact and difficult to define, but with the granting of basic procedural rights in *Gault* [387 U. S. 1 (1967)], right to treatment cases have become the major battleground in the juvenile justice system. *Gault* was a constructive and necessary first step to insure that only those juveniles who have committed antisocial acts are subjected to the involuntary processes of the court. However, the vast majority of juveniles who stand trial are still found guilty, and for those committed to a state agency, the treatment received at the institution is what the system is all about. In some states, enlightened administrators and legislators insure that there is a bona fide attempt to treat, not punish, juvenile offenders. In too many states, however, good intentions must yield to tight financial policies, as juveniles do not rate high on the priority list for the limited available funds. In those states a juvenile's only recourse is to go to the courts to insist that he receive some tangible benefit for his loss of liberty. Eventually the juvenile justice system may survive or fail, but if it survives it must do so on its ability to deliver services and 'treatment', not on empty rhetoric and promises too long delayed." [3]

---

[3] Another recent, excellent discussion, particularly of the right to treatment, may be found in Besharov, Juvenile Justice Advocacy, § 12.7. The whole subject is now under consideration by a joint commission

See, also, Kent v. United States, 383 U. S. 541, 86 S. Ct. 1045, 16 L. ed. 2d 84 (1966).

In light of the inadequacy of the record to permit us to pass upon the complex questions involved, we deem it advisable to remand the case to the juvenile court for an in-depth hearing on several issues which may eventually have a bearing on the final outcome of the case.

In this case, we think the judge of the juvenile court should inquire into (1) whether there is presently any program available for treatment for this and other similar juveniles; (2) if no program is available, whether it is feasible and possible to put together an effective program which could treat this and other similar juveniles; (3) if so, why has the Department of Corrections failed to make such a program available? The answer to this question may involve such things as the unavailability of funds, the establishment of priority between programs, and the time it would take to establish such program.

We think the court should also inquire into the availability of a rehabilitative program for those prosecuted and convicted as adults. In other words, are programs available now for treatment for a person such as appellant under our adult system?

Appellant has also raised a constitutional issue which involves mainly a question of whether the Juvenile Court Act is unconstitutional in that it permits petition, detention, and reference for adult prosecution without requiring a judicial determination of whether there is probable cause to believe the allegations of the petition. We decline to pass upon this question at this stage of the proceedings. When and if a more complete record is presented to us in answer to the questions which we desire to have investigated, the constitutionality of the act may again be presented. As the matter now stands, if it is impossible to establish a rehabilitative program under our present statutes, the case will

---

for drafting juvenile justice standards of the Institute of Judicial Administration (I.J.A.) and the American Bar Association (A.B.A.). See, 7 I.J.A. Report, Oct. 1974, p. 5.

then be ripe for determination as to whether failure to provide such treatment is a violation of any constitutional or statutory right to treatment. In considering this question, the whole thrust of the Juvenile Court Act must be kept in mind. While a juvenile is entitled to due process, In re Gault, 387 U. S. 1, 87 S. Ct. 1428, 18 L. ed. 2d 527 (1967), it must be conceded that there are some differences in handling juvenile cases and adult cases.[4] To destroy the purpose of the Juvenile Court Act would, we fear, lose more for juveniles than they would gain. In drawing a line between what is intended to be accomplished by handling a young person as a juvenile or to treat him as an adult, we cannot lose sight of the fact that the whole purpose of the Juvenile Court Act is to rehabilitate a young person before he or she becomes a menace to society. We must keep in mind that sooner or later nearly all of these individuals are turned loose. The question is, can we turn them loose as safe members of society or should they be permitted to continue and increase their criminal tendencies. In the event the referral to adult prosecution is upheld, there is then no constitutional issue involved. As an adult defendant, he would be given the same rights, protections, and legal remedies as any other adult.

We do not suggest that every judge of a juvenile court in the State of Minnesota should undertake an in-depth hearing on the questions proposed here. That would impose an impossible burden on our juvenile courts and might lead to different results in the different courts. We think the judge of the juvenile court of Hennepin County is particularly well qualified to hold such a hearing. Not only does a large proportion of juvenile cases arise in Hennepin County, our most populous county, but the judge of that court has had many years of experience in dealing with the difficult problems posed in this case.

When a full hearing has been held by that court with appropriate findings and order we will be in a position, should there

---

[4] McKeiver v. Pennsylvania, 403 U. S. 528, 91 S. Ct. 1976, 29 L. ed. 2d 647 (1971) (juvenile has no constitutional right to a jury trial).

be another appeal to this court, to determine rationally some of the issues presented in this case.

The order of referral is vacated and the case remanded to the trial court for further proceedings in conformity with this opinion.

Reversed and remanded.

MR. JUSTICE SCOTT took no part in the consideration or decision of this case.