**Jeffrey T. DEEL, Petitioner–Appellant,**

v.

**Arnold R. JAGO, Respondent–Appellee.**

No. 91–3181.

United States Court of Appeals, Sixth Circuit.

Argued Sept. 19, 1991.

Decided June 18, 1992.

---

11. Section 548 provides:
 (a) The Trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

 (1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; ...
 11 U.S.C. § 548(a)(1).

Albert L. Purola (argued and briefed), Wiles & Richards, Willoughby, Ohio, for petitioner-appellant.

John J. Gideon (argued and briefed), Office of Atty. Gen. of Ohio, Columbus, Ohio, for respondent-appellee.

Before: MERRITT, Chief Judge, RYAN, Circuit Judge, and HARVEY, Senior District Judge *.

* The Honorable James Harvey, Senior United States District Judge for the Eastern District of Michigan, sitting by designation.

MERRITT, Chief Judge.

In 1985 an Ohio jury convicted the defendant, Jeffrey T. Deel, of murdering a ten-year-old child. Jeff Deel was fifteen years old at the time of the crime. There were no eyewitnesses to the murder. No motive for the killing was, or has been, deduced. And Deel steadfastly maintains that he is innocent. Deel was sentenced to fifteen years to life imprisonment. His conviction and sentence were affirmed on direct appeal by Ohio state courts. His petition for habeas corpus relief was denied by the United States District Court for the Northern District of Ohio.

Deel now appeals the denial of the writ. He attacks his conviction on three grounds. Specifically, he asserts that the evidence was insufficient to support a guilty verdict; he claims that prejudicial pretrial publicity denied him an impartial jury in violation of the Sixth and Fourteenth Amendments; and he challenges the constitutionality of Ohio Rule 30 under which the juvenile court determined he should be tried as an adult. We address each claim in turn. But first we set out the facts of this bizarre and tragic case.

## I. FACTS

Because the defendant brings a sufficiency of the evidence claim and asserts significant discrepancies between the versions of events presented to the jury, we have reviewed the entire record and set forth a detailed statement of facts.

At approximately 6:50 pm on October 23, 1984, the body of ten-year-old Danny O'Donnell was discovered lying face down in Lake Erie just off Bennett Road Beach in Madison Township, a Lake County community in Northeastern Ohio. His sister's bicycle which he had been riding was found lying on its side on the top of a retaining wall.

On November 9, 1984, the Madison Township Police Department filed a complaint against the defendant, Jeff Deel, in

the Juvenile Division of the Lake County Court of Common Pleas. That same day, the prosecution filed a motion to transfer the proceedings to the Court of Common Pleas (Adult Division). The juvenile court, pursuant to Ohio Rule 30, conducted a probable cause hearing to determine whether Jeff was amenable to rehabilitation in a juvenile institution or whether the court should waive its jurisdiction so that Deel could be tried as an adult. In December 1984, the juvenile court ordered Deel transferred to the Court of Common Pleas for prosecution as an adult. Deel was thereafter indicted for murder by the Lake County grand jury. At arraignment he pleaded not guilty. He also moved to dismiss the action, claiming that the juvenile court unlawfully waived its jurisdiction. The motion was denied, as was the defendant's motion for a change of venue.

As the prosecutor told the prospective jurors, "[t]here was nobody on that beach that saw the murder we allege." The state's case against Jeff Deel was built upon circumstantial evidence in the form of physical evidence, written statements, and the testimony of twenty witnesses. Deel put forth an alibi defense. During the six day trial, the jury learned the following:

A. *Witnesses' Testimony as to Petitioner's Whereabouts on October 23rd, 1984*

Salvatore Palma, a sixteen year old friend of Jeff Deel's, testified that he and Jeff were together on the afternoon of October 23rd. Palma acknowledged purchasing a six-pack of beer, whereupon Jeff reportedly stole two cans of hair spray-coloring from a local pharmacy. The two boys then rode their bicycles toward Bennett Road Beach where they drank beer, and spraypainted obscenities on a wall. Palma said he left Jeff at the beach at 5:10 pm. Palma recalled that Jeff had a backpack with him.

Two teenage girls testified that they saw Jeff Deel and Salvatore Palma riding their bikes together toward the lake between 4:15 to 4:30 pm on October 23. Both girls remembered Jeff carrying fishing poles,

tackle box, and a net. One girl remembered Deel wearing a backpack.

The victim's mother, Donna O'Donnell, testified that while Jeff was not friends with Danny, Jeff's younger brother, Brian, was a peer and playmate of Danny's. Although Danny was very athletic, and was a particularly strong, competitive swimmer, he did have one known health problem. Two and a half years prior to his death, Danny had been diagnosed as epileptic. Ms. O'Donnell said that Danny suffered one grand mal seizure about every six months, but only at night while asleep. His last known seizure occurred in July 1984. Danny took Dilantin twice daily for his condition.

Jody O'Donnell, Danny's twelve year old sister, testified that at about 6:15 pm, while outside with Danny, she saw Jeff Deel bicycling from the direction of the lake. She said Jeff wore a blue jacket, boots, and an orange knapsack. When Jeff rode by her house, Jody said she heard her brother ask Jeff if he had caught any fish. Jeff said he had, and asked Danny to go with him to the beach to see the fish. She said Danny then accompanied Jeff to the beach.

Charles O'Donnell, Danny's father, stated that at approximately 6:10 pm, he saw Jeff Deel through an open window of his home. He testified to the same conversation and chain of events described by Jody. Mr. O'Donnell recalled that Deel wore a fishing vest and waders and rode a blue ten-speed bike.

Carrie Stoneman, a thirteen year old who lived across the street from the O'Donnells, testified that around 6:10 pm she saw an older, heavyset boy in front of the O'Donnell house as she drove by in a car. She remembered that person wearing a baseball cap, jacket and pants. He had with him an orange knapsack. Though she was unsure on October 23rd who that boy was, at trial she identified him as the defendant.

Debra Cossaboom lived four houses north of the O'Donnells, closer to the lake. Ms. Cossaboom stated that at 6:15 pm on the 23rd, while standing at her front door, she saw Danny riding his sister's bike toward the lake with a husky male on a ten-

speed whom she was unable to identify. Pamela Byers, a neighborhood resident, said that shortly after 6:00 pm, while in her yard, she saw a small blond boy and a larger boy ride their bicycles past their house. She could not identify the larger boy, but noted that he wore a dark jacket and pants. Though she did not know the smaller boy's name at the time, she did recognize him to be a neighbor.

Lowell McCoy lived a few hundred feet from Bennett Road Beach. Mr. McCoy testified that from his yard he saw a male sitting on the beach breakwall. He said that the person sitting on the breakwall wore a dark blue windbreaker and a reddish backpack. He also noticed "a small kid running around the end of Bennett Road...." McCoy made these observations shortly after 6:00 pm. He did not recall seeing any fishing equipment or bicycles. McCoy left his home fifteen to twenty minutes later, at dusk, and while driving spotted the person he thought he had seen on the breakwall riding a bike away from the lake. The person was wearing a knapsack. He could not identify the person he saw as Jeff Deel.

Ms. Susan Zuzek testified that between 6:10 and 6:15 on the evening of the 23rd, her husband called her at home to request a ride. She left home 25 to 30 minutes later as dusk descended. While driving, she witnessed "a bigger fellow" wearing a beige fishing or hunting vest turn off of Bennett Road onto Madison Avenue, riding his bike in the opposite direction from which she was travelling. At trial, Ms. Zuzek identified the person on the bike as Jeff Deel.

At 6:58 pm, the police were notified that passers-by had discovered a body in the water off of Bennett Road Beach. Shortly after 7:00 pm Donna and Charles O'Donnell, who had gone to Bennett Road Beach in search of Danny, were informed by police at the scene that their son was dead. Jeff Deel was then summoned to the police station where he gave a written statement of his whereabouts that evening. Sergeant James Dooley, who was with Jeff at the station, looked for, but did not spot any markings, scratches, or bruises on Jeff's hands and face. No fingernail scrapings were taken of the defendant.

B. *Physical Evidence*

Sergeant James Dooley was one of the first officers to arrive at the crime scene. He testified that when he got to the beach he jumped off a five foot high retaining wall where the victim's bicycle was found into a "puddle" of blood. It was then that Sergeant Dooley realized that a homicide might have been committed. He instructed the fire and police personnel on the scene to preserve any evidence found. Sergeant Dooley found a board a few inches from the puddle of blood. Beneath the board he found more blood. Moreover, an indentation in the sand about two inches wide traced an eleven foot arc from the puddle of blood towards the lake where the body was discovered. Officers surmised this indentation was a "drag path". Splatters of dried blood were found in the path. Two days later, criminalist Barbara Caraballo observed blood spots on the retaining wall at the beach.. The spots extended three inches from sand level to approximately twenty-one inches up the wall. As Caraballo was analyzing the blood, it began to rain. The rain obliterated the patterns and precluded further testing.

Sergeant Dooley tried to identify footprints on the beach near the wall, puddle, path, and body, but the consistency of the sand was such that it did not retain prints. Also found on the beach were two empty Miller beer bottles, a pair of tennis shoes, white tube socks, and a lone tennis shoe. Later in the evening of the 23rd, after Jeff had provided a written statement, Sergeant Dooley went to the Deel home where he was given Jeff's tennis shoes, which had been soaking in a wash basin. Sergeant Dooley also obtained prints of Jeff's bicycle tire impressions and photographed Jeff's bike, waders, and jacket.

On October 24, a police officer collected from the Deel residence a pair of waders, a fishing vest and rain jacket which he later bagged and tagged. On October 25, officers returned to the Deel home and obtained Jeff's hiking boots and blue cordu-

roy pants which Jeff said he wore on the 23rd and which had since been washed and worn. They also retrieved an orange knapsack which was empty. The items were neither marked nor bagged by the officers and were placed on the back seat of the squad car. The items were then transferred to the back seat of another squad car and then transferred to Barbara Caraballo's possession that afternoon. Immediately prior to receiving these articles, Caraballo had been at Bennett Road Beach inspecting blood spots on the beach's retaining wall.

C. *Expert Testimony and Forensic Evidence*

Dr. J.M. Edelstein, a pathologist, performed Danny's autopsy. He observed that the forward half of Danny's skull was completely shattered, his face extensively contused, his neck had bruises, scratches and compression marks indicative of strangulation, and his lungs had multiple pinpoint hemorrhages.

Dr. Edelstein testified that Danny's death resulted from manual strangulation *and* several blunt and forceful impacts to the face. "He died from both [causes], in my opinion." Dr. Edelstein was unable to determine which occurred first, the impacts to the head or the strangulation. He stated that a laceration over the eye would cause a fair amount of bleeding. Smear tests for seminal fluid were negative. No test was run to detect the presence or absence of anti-epileptic medicine, such as Dilantin, in Danny's bloodstream or organs. Dr. Edelstein stated that the body had been in the lake "a very brief time." He ruled out drowning as a cause of death, as he found no water in the child's lungs. On cross-examination, the pathologist acknowledged the phenomenon of "dry lung" drowning, where spasms of the glottis prevent the inhalation of water into the lungs, though drowning is still deemed the cause of death. He further acknowledged that a certain type of hemorrhage in the lung, petechial hemorrhaging, is consistent with drowning and inconsistent with strangulation. Dr. Edelstein, however, refused to categorize the type of hemorrhages found in Danny's lungs.

As a criminalist, Barbara Caraballo analyzes physical evidence, including blood, hairs, fibers, and footprints found at crime scenes. Caraballo testified that Danny O'Donnell had type O blood with enzyme characteristics that matched only 2.7 percent of the caucasian American population. Jeff Deel has blood type B. Analyzing the type and enzyme characteristics of the blood on the board, woodsplinter, and sand collected by investigators at the beach, she determined that this blood was identical to Danny's. Caraballo also found blood on the orange knapsack recovered by police from the Deel garage. Tests performed on a blood smear found on the knapsack's nametag showed that the blood type and enzymes matched Danny's. The blood smear (which measured 5 by 10 millimeters in size) was destroyed in the testing.

Caraballo further testified that approximately two hundred minute blood spots were present on the top, upper portions of the right and left straps, and on the side and back portion of the left strap of the orange knapsack. Although Caraballo determined that the blood was of human origin, the spots were too small to conduct blood and enzyme typing. She did, however, conduct a bloodstain patterning analysis.[1] She indicated that the pattern of

---

1. Ms. Caraballo was twenty-five years old at the time of trial and held a Bachelor of Science degree in Forensic Chemistry. She served as an intern at a Regional Forensic laboratory, and had taken seminars on several specialized topics within forensic science. In 1984, Caraballo completed a one-week workshop on bloodstain pattern analysis. Bloodstain pattern analysis is used to determine what kind of actions could have caused a particular blood pattern to form (e.g., via falling blood, blood cast off from an object, blood from forceable blows, etc.). This workshop, together with some individual experimentation, one year of college physics, and familiarity with two books on bloodstain pattern interpretation comprised the breadth of her experience in this field at the time of her testimony. This level of training contrasts sharply with that of Herbert MacDonnell, whose bloodstain pattern testimony was admitted in *State v. Hall,* 297 N.W.2d 80 (Iowa 1980). In that case, a divided en banc court allowed MacDonnell to testify as an expert concerning bloodstain patterning, noting that MacDonnell, a professor of

spots on the knapsack was caused by two directions of blood dispersion. Some blood spots, those on the right strap, she said, resulted from blood falling and hitting the backpack. The spots on the left strap appeared as impact spatters, that is, blood broken into small droplets and dispersed as a result of a blow or force. Caraballo looked for but did not find blood on Jeff Deel's waders, rain slicker, fishing vest, hiking boots, blue corduroy pants, tennis shoes, or bicycle. Nor did she find any hairs or fibers on the blood-soaked board. She was also unable to identify from photographs the source of footprints on the beach due to the sand's consistency.

### D. Defendant's Alibi

Jeff Deel liked to fish and did so almost every day after school at Arcola Creek and Bennett Road Beach. He especially liked to fish Arcola Creek in the fall, when the Coho salmon swim up the creek. While Jeff admitted going to Bennett Road Beach and Arcola Creek on October 23rd, he denied going to the beach with Danny O'Donnell. He claimed instead that during the time in question, he quit fishing at Arcola Creek, rode his bike past Danny's house, stopped to chat briefly with Danny about fishing, then rode away, without Danny, to buy dinner at a small grocery, and returned home shortly before 7:00 pm.

Jeff's alibi defense, however, suffered two major shortcomings. First, there was the conflicting testimony of witnesses outlined above. This testimony tended to place Jeff and Danny together on their bikes riding towards the beach shortly after 6:00 pm. Second, Jeff's credibility was damaged by the fact that in a sworn statement to police made a few hours after Danny's death, Jeff denied seeing Danny O'Donnell that evening. Though he was asked to write down everything he did after school, Jeff also failed to mention seeing Salvatore Palma.

Jeff was interviewed by police a second time on October 26, 1984. Richard Amiott, then Chief Deputy of the Lake County

Sheriff's Department, received Jeff's parents' consent to interview Jeff alone. Amiott also informed Jeff that Jeff could leave the interview at any point. Jeff waived his Miranda rights. Initially, Jeff repeated the story he gave on the 23rd, denying he had seen or spoken to Danny O'Donnell. Amiott confronted Jeff with the conflicting statements of neighbors and Deel family members and told Jeff that he thought Jeff was lying. Jeff subsequently admitted that he had seen and spoken to Danny on the afternoon of the 23rd. He said that after fishing at Arcola Creek he rode by Danny's house and had a brief conversation with Danny about a fish he had caught, whereupon he left, and proceeded to get food. Jeff also admitted to having spent time with Palma that same afternoon. He explained that he was afraid to tell the police about seeing Palma earlier because his parents had forbidden him from seeing Palma and would punish him if they discovered that he disobeyed them.

As the interview wore on, Amiott pressed Jeff about his inconsistent statements and cover-ups. Then, according to Amiott, the following exchange took place: "... I was talking to Jeff, 'You were with Danny as the witnesses said. Now, there are other people that saw you with a young boy after that, after 6 o'clock. And I want you to tell me the truth of what took place.' We talked for a couple of minutes." Jeff then "raised his head in anger, and blurted out 'Yes, I did it.'" Amiott then said, "I want the details." Jeff responded, "You tell me." Amiott said, "No, that's not how it works. I want the truth and the details." And Jeff said, "That's what you wanted me to say, isn't it?"

By this point, two and one-half hours into the interview, Amiott described Jeff as tense and as fighting back tears. After this exchange Jeff fell silent and the interview came to a close.

At trial the following March, Jeff repeated his alibi (drank beer with Palma, fished Arcola Creek, rode by Danny's

criminalistics, had spent two years researching bloodstain patterning on a federal grant, was an author of a forthcoming text on bloodstain pattern analysis, and was "one of the few people in the nation qualified in this field." *Id.* at 83.

house, chatted with Danny, rode away alone to buy dinner). Jeff denied stealing spraypaint and painting obscenities on the break wall.

While eating his food at a local laundromat, Jeff said he glanced at a clock and noticed the time was 6:22 or 6:23 pm. He then played two games of pinball and said he arrived home shortly before 7:00. Jeff's older brother, Paul, and younger brother Brian, each testified that Jeff returned around 6:45.

At home, Jeff removed his fishing gear in the garage. He placed his tennis shoes (which he wore over his waders in the lake) in the washing machine which was already filled with water. Jeff washed his shoes every night after fishing because he owned only one pair of tennis shoes and needed to wear them to school the next day. Jeff's parents testified that Jeff and Paul each owned an orange knapsack, that the packs were labeled with the boys' names, that both packs were stored in the garage, and that Paul no longer used his pack. Jeff claimed that he wore Paul's knapsack fishing on the 23rd—not the knapsack examined by Barbara Caraballo.

At trial, Jeff acknowledged that he omitted seeing Danny in his initial statement: "I was scared and I was frightened ... I knew that Danny was dead, you know, on the beach." Regarding his admission to Chief Amiott, Jeff claimed it was made out of anger and was untrue. "[H]e kept on asking those questions [about Danny's death] over and over and over and over again, several times." "[A]nd then every time he asked me the same questions over, he raised his voice higher and higher until he was yelling," Jeff claimed. "... I just got sick and tired of him asking the questions, because I didn't know nothing about it, and I was just so angry and furious that I just jumped up and I said, 'Okay, I did it.' I didn't mean it or anything, but that's what he wanted me to say, so I said it for him." Jeff's father testified that Amiott told him and his wife that their son's admission had been made out of frustration. Amiott denied making this statement, as well as yelling at Jeff during the interview.

In sum, Jeff's trial testimony conflicted with that of Salvatore Palma, who spoke about the spraypainting incident; Deputy Police Chief Amiott, who denied yelling at Jeff while questioning him; Jody and Charles O'Donnell, who said they saw Jeff and Danny ride their bikes toward the lake; and Susan Zuzek, who claims to have seen Jeff on his bike (as opposed to the laundromat) at 6:22 pm on the evening of October 23rd. Jeff did not produce any witnesses who could place him at the laundromat. Nor did the defense offer any other explanation for Danny's death.

The defense, though, did try to discredit the forensic evidence introduced by the state. Attempting to account for the blood spatters on the knapsack, they suggested that Jeff's younger brother Brian, who spent much time with Danny, brought the pack to Danny's house for a sleep-over party, or used it on a camping trip with Danny, during which time Danny could have scraped himself and bled. Alternatively, the defense suggested that blood from the crime scene could have contaminated the knapsack when Sergeant Dooley inspected the Deel garage a few hours after having jumped into a puddle of blood at the beach, or two days later when the knapsack was taken from the Deels and given to Barbara Caraballo. The defense argued that when officers got the knapsack on October 25, they placed it on the backseat of a squad car which also contained the blood-stained clothing of Danny O'Donnell which had just been retrieved from the Coroner's office. Both the knapsack and the clothing were then handed over to Ms. Caraballo, who had just been testing blood on the retaining wall.

E. *Verdict and Subsequent Proceedings*

The jury found Jeff Deel, a high school sophomore, guilty of murder. Deel was sentenced to fifteen years to life imprisonment. The defendant's motion for judgment of acquittal was denied. Deel appealed his conviction to the Ohio Eleventh District Court of Appeals, advancing seven assignments of error. On September 30, 1986, the appellate court affirmed the con-

viction. The Ohio Supreme Court denied leave to appeal.

The defendant then filed a federal habeas corpus petition in the District Court for the Northern District of Ohio. The District Court, after *de novo* review, adopted, with some modification, the magistrate judge's report and recommendation that the defendant's petition be denied. Mr. Deel now seeks habeas relief from this Court.

## II. SUFFICIENCY OF EVIDENCE

■ Deel claims there was insufficient evidence to support a guilty verdict on aggravated murder. The Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), held that the constitutional issue in sufficiency of the evidence cases under the Due Process Clause is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

To adequately assess this claim, we have reviewed the record in its entirety. In the process, we have uncovered some troubling facts, some of which never reached the jury. For instance, Lowell McCoy testified to having seen "a small kid" running around Bennett Road Beach a short distance from a larger boy sitting atop the breakwall. But in a written statement provided police shortly after Danny's death, McCoy omitted any mention of a small child playing at the beach. Only after police officer James Dooley met with McCoy did McCoy supplement his story to coincide with that told at trial. Jody O'Donnell (Danny's sister) offered the jury a description of what Jeff wore on the 23rd. This description matched that given by her father. Yet this description was inconsistent with that given by Jody under oath at the probable cause hearing in juvenile court. We then learn from a discussion at sidebar that Jody is retarded. One more potential discrepancy: despite Mrs. O'Donnell's insistence that Danny suffered grand mal epileptic seizures only at night while asleep, Danny's father found him one afternoon passed out in the driveway. In a separate afternoon incident, before Danny was diagnosed as epileptic, Danny fell out of a tree house, whereupon he began to vomit and tremble, and then blacked out. On both occasions Danny was hospitalized.

These facts and discrepancies are unsettling, especially in the context of a terrible crime for which there is no known motive. Nevertheless, we agree with the district court that while Deel's claim presents "a close question," the evidence is sufficient to withstand constitutional challenge. The testimony of several individuals, if believed, place Jeff Deel near the scene of Danny O'Donnell's death at the time of his death. Testimony also was presented linking blood on Jeff's knapsack to Danny O'Donnell. Further, Jeff admits lying to the police as to his whereabouts on the evening of Danny's death. It is for the jury, not this court, to assess the credibility of the witnesses presented at trial. A rational jury assessing the facts of this case could conclude beyond a reasonable doubt that Jeff Deel is guilty of aggravated murder.

## III. JURY SELECTION

■ The defendant contends that his Sixth Amendment right to an impartial jury and his right to due process under the Fourteenth Amendment were violated by the trial court's refusal to allow the defendant to conduct individual voir dire of potential jurors outside the presence of other potential jurors.

Jury selection occurred as follows. Twelve prospective jurors were brought in, whereupon the court and counsel questioned them both collectively and individually with all twelve present, replacing those excused as necessary. Danny O'Donnell's death, the subsequent investigation, and the juvenile court's waiver of jurisdiction over the defendant were the subject of approximately 50 articles appearing in local newspapers by the time of trial. The defense counsel asked each prospective juror if he or she had read or heard of these newspaper accounts, to what extent he or she had formed an opinion about the case, and whether he or she would be able to set

aside any preconceptions in order to be a fair and impartial juror. Of the 24 prospective jurors, 21 had heard or read about the crime. Of the 12 venirepersons eventually sworn as jurors, 9 had read or heard something about the case. Prospective jurors who stated they would have difficulty being objective were excused by peremptory challenge. None of the seated jurors stated that they had formed an opinion, and none of them were challenged for cause. Nor did the defendant object to the final composition of the jury.

The issue presented on habeas review is whether individualized voir dire was constitutionally mandated in this case. Since Deel's first habeas petition, the Supreme Court, in *Mu'Min v. Virginia,* — U.S. ——, 111 S.Ct. 1899, 1904, 114 L.Ed.2d 493 (1991), has addressed this issue. *Mu'Min* forecloses the defendant's claim.

In *Mu'Min,* a Virginia inmate serving time for first degree murder committed a second murder while on a prison work detail. This 1988 crime engendered substantial publicity in the local media, particularly in light of the case of Willie Horton, whose rape and assault of a woman while on prison furlough in Massachusetts became a major issue in the 1988 presidential campaign. The trial court denied Mu'Min's motion for individual voir dire (interrogation was conducted in panels of four jurors) and refused to ask any of Mu'Min's proposed questions relating to the content of news items that potential jurors might have seen or read. Although 8 of the 12 jurors eventually sworn admitted they had read or heard something about the case, none indicated that they had formed an opinion based on outside information. The jury found Mu'Min guilty of first degree murder and sentenced him to death.

The Supreme Court held in *Mu'Min* that the trial judge's refusal to question prospective jurors individually about the specific contents of news reports to which they had been exposed did not violate Mu'Min's Sixth Amendment right to an impartial jury or his right to due process under the 14th Amendment. The Court reiterated that a trial court "retains great latitude in deciding what questions should be asked on *voir dire.*" 111 S.Ct. at 1904. When viewed against the facts and language of *Mu'Min,* Deel's jury selection claim must fail.

In refusing the defendant's request to isolate and question individual prospective jurors about the content of the news items that they came across, the trial judge said:

> I think you can ask sufficient questions to find out what's in the juror's mind, to determine whether or not he would be affected by any publicity ... [I]f [the jurors] say, in response ... that they can be fair and impartial and put aside what they have read, the issue is not whether they read something ... The question is whether they can put it aside and decide the issue based only on the testimony that comes into the courtroom.

The defendant argues that "individualized voir dire was the only appropriate means of learning what each juror knew about the case, and how it actually affected their impartiality." He submits that it is unconstitutional to "deprive[ ] [the defendant] of the opportunity to learn what knowledge the juror has." The *Mu'Min* Court, however, rejected this contention.

> Undoubtedly, if counsel were allowed to see individual jurors answer questions about exactly what they had read, a better sense of the juror's general outlook ... might be revealed, and such a revelation would be of some use in exercising peremptory challenges. But, since peremptory challenges are not required by the Constitution ... this benefit cannot be a basis for making "content" questions about pretrial publicity a constitutional requirement.

111 S.Ct. at 1905 (citations omitted).

"Content" questions are constitutionally compelled only if the trial court's failure to ask such questions renders the defendant's trial "fundamentally unfair." 111 S.Ct. at 1905. "The nature of the publicity and whether it is the sort that could be laid aside by jurors ... is the crucial factor to be considered." *Brofford v. Marshall,* 751 F.2d 845, 851 (6th Cir.1985). We have reviewed the newspaper articles, which were part of the record, and conclude that they

were neither so numerous nor inflammatory as to render the defendant's trial fundamentally unfair in the absence of individualized voir dire. To the contrary, the vast majority of the stories were quite brief and simply provided bare-boned facts about the case. Further, the transcript of the voir dire does not reveal any suggestion that the jurors eventually seated, though familiar with the crime, harbored any preconceptions about the defendant's guilt.

Accordingly, we hold that the defendant's voir dire comported with the Constitution.

## IV. JUVENILE COURT WAIVES JURISDICTION

 Finally, the defendant challenges the constitutionality of Rule 30 of Ohio's Rules of Juvenile Procedure. That rule sets forth the procedural law for the transfer (or "waiver") of juveniles to adult court for prosecution. Specifically, the defendant argues that Rule 30 violates the Due Process Clause of the Fourteenth Amendment by providing insufficient standards to guide the juvenile court in making its transfer decision. The district court rejected the defendant's claim. We review *de novo* this question of law.

Ohio's Rule 30 permits Ohio juvenile courts to relinquish their jurisdiction over a child fifteen or more years of age. Before transfer can take place, however, the juvenile court must make a series of findings. First, the court must hold a preliminary hearing "to determine there is probable cause to believe that the child committed the act alleged and that such act would be a felony if committed by an adult." Juv.R. 30(A). If the court finds probable cause, "it shall continue the proceedings for full investigation." Juv.R. 30(B). At these further proceedings the court "shall ... determine whether to transfer jurisdiction."

Parts (C) and (E) of Rule 30 set out the specific factors that are to guide the court's transfer decision. Part (C) states that the juvenile court must find "reasonable grounds" to believe:

(1) The child is not amenable to care or rehabilitation in any facility designed for the care, supervision and rehabilitation of delinquent children; *and*

(2) The safety of the community may require that the child be placed under legal restraint for a period extending beyond the child's majority.

Juv.R. 30(C) (emphasis added).

Part (E) fleshes out the requirements of Part (C)(1). "In determining whether the child is amenable to the treatment or rehabilitative processes available to the juvenile court, the court shall consider:

(1) The child's age and his mental and physical health;

(2) The child's prior juvenile record;

(3) Efforts previously made to treat or rehabilitate the child;

(4) The child's family environment; and

(5) School record."

Juv.R. 30(E). Part (G) of the rule mandates that a juvenile court which waives jurisdiction "shall state the reasons therefor." *See also* the statutory counterpart to Juv.R. 30, OHIO REV.CODE ANN. § 2151.26 (Baldwin 1991).

What constitutes "reasonable grounds" for relinquishing jurisdiction has been held to to lie within the sound discretion of the juvenile court. *State v. Carmichael*, 35 Ohio St.2d 1, 64 O.O.2d 1, 298 N.E.2d 568 (1973), *cert. denied*, 414 U.S. 1161, 94 S.Ct. 922, 39 L.Ed.2d 113 (1974). Further, there is no requirement that each, *or any*, of the five factors in Rule 30(E) be resolved against the juvenile, so long as the totality of the evidence supports a finding that the juvenile is not amenable to treatment. *See State v. Douglas*, 20 Ohio St.3d 34, 20 OBR 282, 485 N.E.2d 711, 713 (1985) (citing *State v. Oviedo*, 5 Ohio App.3d 168, 5 OBR 351, 450 N.E.2d 700 (1982)). The juvenile court, however, is required to provide "a statement of the reasons motivating waiver including ... a statement of the relevant facts" in order that a reviewing court can undertake "meaningful review." *Kent v. United States*, 383 U.S. 541, 561, 86 S.Ct. 1045, 1057, 16 L.Ed.2d 84 (1966).

The decision of whether to waive juvenile jurisdiction in a given case is one which the

legislature of Ohio, like the legislatures of many other states, has committed to the sound discretion of the juvenile court. The juvenile courts were founded upon the principle that such courts would wield broad discretion over the child's fate. The leaders of the criminal justice reform movement at the turn of the century advocated an individualized approach whereby juvenile court professionals would make discretionary, individualized treatment decisions for juvenile offenders. *See* Barry C. Feld, *The Juvenile Court Meets the Principle of the Offense: Legislative Changes in Juvenile Waiver Statutes,* 78 J.CRIM.L. 471, 475–76 (1987); SAMUEL M. DAVIS, RIGHTS OF JUVENILES §§ 1.1–1.2 (2d ed. 1987). "The juvenile court movement envisioned an expert judge who was assisted by social service personnel, clinicians, and probation officers who investigated the background of the child, identified the sources of the child's misconduct, and developed a treatment plan to meet the ... best interests of the child." Feld, *supra,* at 477. In this context, the fact that Ohio's criteria are not subject to mechanical application but instead require the court to look at the totality of circumstances and make a judgment call as to amenability can be "seen as a positive virtue in light of the individualizing concept implicit in juvenile law ..." SANFORD J. FOX, THE LAW OF JUVENILE COURTS 243 (1977).

The defendant argues, however, that the juvenile court's discretion "is *entirely* unguided," and thus violates due process (emphasis added).

We wish to note at the outset that a review of Jeff Deel's transfer hearing reveals the enormous discretion afforded the juvenile court. A close reading of the hearing transcript discloses scant evidence that

Jeff was "not amenable" to rehabilitation in light of the five factors set out in Part E of Rule 30. To the contrary, as a fifteen year old, Jeff was at the bottom end of the age range eligible for transfer. *See* Juv.R. 30(E)(1). He had no juvenile court record.[2] *See* Juv.R. 30(E)(2)–(3). Moreover, even the prosecutor admitted that Jeff came from a "normal family environment." *See* Juv.R. 30(E)(4).

What is more, the Administrator of Specialized Treatment Services with the Ohio Department of Youth Services testified that Ohio had a "very significant range" of programs, including psychiatric, psychological, medical, educational, and vocational services available for serious juvenile offenders. He stated that the Department had an "intensive" program complete with a Homicide Review Committee to deal with adjudicated delinquent murderers. Further, the administrator, who holds a Masters in Corrections and served within the Ohio Department for twenty seven years, stated "[i]t has ... been my experience, as an institutional superintendent ... that homicide offenders are perhaps your more amenable youth to work with."[3] *See* Juv.R. 30(C)(1). *Cf. In re J.E.C.,* 302 Minn. 387, 225 N.W.2d 245 (1975) (juvenile court waived jurisdiction over juvenile offender because "no program exists or has been designed which can rehabilitate [the child]." Minnesota Supreme Court remanded case to juvenile court so judge could determine the reasons behind the unavailability of treatment programs and the feasability of implementing such programs).

Despite these findings which militate against transfer, the juvenile court declared that Jeff was not amenable to rehabilitation and relinquished its jurisdiction

---

**2.** Jeff did have some prior disciplinary problems, including six separate offenses occurring between February 13, 1984 and August 5, 1984, which were treated by the Madison Police Youth Division Officer. The prosecutor described these run-ins as "nothing major." Jeff's school record also indicated some mischievous and immature behavior.

**3.** At the time of the defendant's transfer hearing, Ohio's youth services system housed thirty

eight child murderers—seventeen of whom were labeled as "aggravated" murderers—in secure facilities enclosed by re-enforced fences. A child offender could be held up until the age of 21. At 21, if the ward exhibits an "extenuating pathology" which renders him dangerous to the public, he could be probated over to mental health services. Otherwise he would be released.

over him. In reaching this result, the court focused—indeed, fixated—on the single factor which made Jeff "look like" an adult offender: the severity of the crime he allegedly committed. "The nature of the crime in this case is most significant," the court acknowledged. "[T]he safety of the community ... require[s] that the child be ... transferred to the adult court...."

The transfer of a juvenile to the adult criminal process is a grave step. The proper exercise of discretion in Ohio contemplates an informed determination reached by the demonstrated application of reason to facts and circumstances appearing in the record. Viewed in this light, the juvenile court's transfer decision is open to serious criticism. The court set out relevant facts. It also explained the basis for its decision: public safety demanded that Jeff Deel, if convicted, be incapacitated beyond the age of twenty one. But the court provided no reasons which connect the facts to its conclusion, save the severity of the crime alleged.

A rehabilitative conception of juvenile court jurisdiction, the conception Ohio has adopted, is inconsistent with allowing the character of the crime to overshadow salient facts about the character of the child (not to mention the nature of services available for the child) when assessing a child's amenability to rehabilitation. It is inconsistent with the principle that "the seriousness of a first offense provides little basis for distinguishing those youths who are likely to recidivate from those who are not." Feld, *supra* at 496 (citations omitted). *See also*, PAUL A. STRASBOURG, VIOLENT DELINQUENTS 35–36 (1978) ("... [D]elinquents who engage in violent crime do not usually do so repeatedly"); Barry C. Feld, *Reference of Juvenile Offenders for Adult Prosecution: The Legislative Alternative to Asking Unanswerable Questions*, 62 MINN.L.REV. 515, 566–71 (1978). This rehabilitative principle is also flouted when a juvenile court ignores the panoply of services provided by a state to diagnose, treat, educate, discipline, and train young offenders.

The juvenile court relinquished jurisdiction over Jeff Deel on the basis of retribution and deterrence, not rehabilitation. But neither Ohio's transfer rule nor the court's transfer decision run afoul of the Constitution.

The defendant is mistaken when he asserts that the court's waiver determination "is entirely unguided." Rule 30 provides detailed standards to guide the juvenile court's waiver decision. In fact, Ohio's rule provides similar or greater guidance than the transfer rules of several other states. *Cf.*, WASH REV.CODE ANN. § 13.40.110(2) (West 1991); S.D. CODIFIED LAWS ANN. § 26–11–4 (1971) (amended 1977); UTAH CODE ANN. § 78–3a–25 (1971) (amended 1991); and WIS. STAT.ANN. § 48.18 (West 1969) (amended 1979). Due process challenges to these states' juvenile court waiver rules, nevertheless, have been rejected. *In re Burtts*, 12 Wash.App. 564, 530 P.2d 709 (1975) (rejecting due process challenge to Washington's juvenile court waiver statute); *People in Interest of L.V.A.*, 248 N.W.2d 864 (S.D. 1976) (rejecting constitutional challenge to South Dakota's 1971 waiver statute); *State ex rel. Salas*, 520 P.2d 874 (Utah 1974) (rejecting constitutional challenge to Utah's 1971 waiver statute); *In re F.R.W.*, 61 Wis.2d 193, 212 N.W.2d 130 (1973), *cert. denied*, 416 U.S. 974, 94 S.Ct. 2000, 40 L.Ed.2d 563 (1974) (rejecting void for vagueness challenge to Wisconsin's 1969 waiver statute). *See also Burtts*, 530 P.2d at 715 (listing additional decisions upholding juvenile court waiver statutes that contained "rather minimal standards" to guide transfer decision).

To treat a child as an adult based *solely* on the severity of a single crime may be unwise, but it is not unconstitutional when done in accordance with a valid transfer statute, like Rule 30. The Supreme Court in *Kent* contemplated that the seriousness of the offense would be material to a juvenile court's waiver decision. *See* Appendix to Opinion of the Court, 383 U.S. at 566–67, 86 S.Ct. at 1059–60 (listing eight relevant factors to be considered when making waiver decision, the first three of which concern the nature of the offense). More-

over, at least fourteen states exclude youths from their juvenile courts on the basis of a serious present offense alone.[4]

The juvenile justice system was founded upon the principle that for the delinquent child, the aim is to correct, re-educate, re-direct, and rehabilitate, rather than to punish or to seek retribution for misdeeds. Affording juvenile courts broad discretion throughout all phases of the juvenile court proceedings is widely considered central to the rehabilitative model. But as the public has grown more and more pessimistic about the juvenile justice system's ability to stem rising crime rates and insure the safety of citizens, this discretion increasingly has been used to promote retributive rather than rehabilitative ends. As Jeff Deel's example illustrates, imprisonment, not treatment, is often the preferred solution for dealing with first-time child offenders who commit serious crimes.

## V.

So concludes this tragic case. The judgment of the district court denying the petition for a writ of habeas corpus is AFFIRMED.

RYAN, Circuit Judge (concurring separately).

The chief judge's very thorough and carefully written opinion affirms the judgment of the district court denying the petitioner's request for habeas corpus relief. I fully concur in that conclusion and in the reasons stated in support thereof, except for portions of the discussion in part IV. of the opinion. Because I do not subscribe to all of what my brother has written in part IV., I concur, with respect to that portion of the opinion, only in the conclusion that "neither Ohio's transfer rule nor the

court's transfer decision run afoul of the Constitution."

---

**4.** Maryland and Mississippi require that youths charged with offenses punishable by death or life imprisonment must be tried as adults. Connecticut, Delaware, District of Columbia, Idaho, Illinois, Indiana, Louisiana, Nevada, New York, Oklahoma, Pennsylvania, and Vermont require the same when the youth is charged with the most serious felony offenses in the criminal code (murder, criminal sexual conduct, armed

robbery, and kidnapping). *See Burtts,* 530 P.2d at 716; Barry C. Feld, *The Juvenile Court Meets the Principle of the Offense: Legislative Changes in Juvenile Waiver Statutes,* 78 J.CRIM.L. 471, 514–15 (1987). *But see, Commonwealth v. Greiner,* 479 Pa. 364, 388 A.2d 698 (1978); *C.L.A. v. State,* 137 Ga.App. 511, 224 S.E.2d 491 (1976) (The nature of the crime alone cannot establish the absence of amenability to rehabilitation).